**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| )<br>LARRY KLAYMAN, *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>BARACK OBAMA, President of the )<br>United States, *et al.*, )<br>)<br>Defendants. )<br>)<br>_____ ) | Civil Action No. 14-cv-00092 (RJL) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
<u>OF THE GOVERNMENT DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................4

I.      STATUTORY AND PROGRAMMATIC BACKGROUND ...........................................4

II.     PLAINTIFFS' ALLEGATIONS IN THIS CASE (*KLAYMAN III*) ...................................4

III.    PROCEDURAL HISTORY..................................................................................6

ARGUMENT ......................................................................................................7

I.      THE COMPLAINT SHOULD BE DISMISSED FOR VIOLATING THE
        RULE AGAINST CLAIM-SPLITTING ..................................................................7

II.     PLAINTIFFS HAVE NOT ESTABLISHED THAT THIS COURT HAS
        JURISDICTION OVER ANY OF THEIR CLAIMS .......................................................10

        A.      Plaintiffs Lack Standing to Challenge the Bulk Telephony
                Metadata Program ................................................................................12

                1.      Plaintiffs' Fourth Amendment Claim ........................................................12

                2.      Plaintiffs' First and Fifth Amendment Claims...........................................19

        B.      This Court Is Also Without Jurisdiction to Hear Plaintiffs' Challenge
                to the NSA's Discontinued Bulk Internet Metadata Program ..............................20

        C.      Plaintiffs Do Not Have Standing to Challenge the NSA's PRISM
                Collection under Section 702 of the FISA.............................................21

        D.      Plaintiffs Lack Standing to Challenge an Alleged "MUSCLUAR"
                Program......................................................................................23

III.    PLAINTIFFS' FOURTH, FIRST, AND FIFTH AMENDMENT
        CHALLENGES TO THE ALLEGED NSA INTELLIGENCE PROGRAMS
        FAIL AS A MATTER OF LAW .................................................................23

        A.      Plaintiffs' Fourth Amendment Claim Fails as a Matter of Law ...........................24

                1.      The Section 215 Telephony Metadata Program Does Not
                        Violate Plaintiffs' Fourth Amendment Rights...........................................24

a. Under *Smith*, Plaintiffs have no protected privacy interest in telephony metadata ........................................................25

b. *Smith* is not distinguishable from this case ..........................................28

c. Even if Plaintiffs had a reasonable expectation of privacy in telephony metadata about their calls, they have not shown that an invasion of that interest has occurred ...............................................32

d. The telephony metadata program is reasonable ...................................33

2. The NSA's Discontinued Bulk Collection of Internet Metadata Did Not Violate Plaintiffs' Fourth Amendment Rights ...........................35

3. The NSA's PRISM Collection under Section 702 of FISA Does Not Violate Plaintiffs' Fourth Amendment Rights ...................................37

B. Plaintiffs' First Amendment Claim Fails as a Matter of Law ...............................39

1. Good-Faith Investigatory Conduct Not Intended to Deter or Punish Protected Speech or Association Does Not Violate the First Amendment ......................................................................................39

2. The Challenged Programs Impose No Direct or Substantial Burden, or Chilling Effect, on Plaintiffs' Expressive or Associational Rights ...............................................................................41

C. Plaintiffs Fail to State Due Process Claims under the Fifth Amendment .............42

1. Plaintiffs' Substantive Due Process Claim Should Be Dismissed as Duplicative of Their Fourth Amendment Claim ...................................42

2. Plaintiffs' Procedural Due Process Claim Is Also Meritless ....................43

CONCLUSION ...........................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**                                                                                                        **PAGE(S)**

*ACLU Found. v. Barr,*
    952 F.2d 457 (D.C. Cir. 1991) ......................................................................................... 39

*ACLU v. Clapper,*
    959 F. Supp. 2d 724 (S.D.N.Y. 2013) ..................................................................... passim

*Agostini v. Felton,*
    521 U.S. 203 (1997) ........................................................................................................ 31

*Albright v. Oliver,*
    510 U.S. 266 (1994) ........................................................................................................ 42

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................. 24, 42

*In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d),*
    830 F. Supp. 2d 114 (E.D. Va. 2011) ............................................................................ 36

*Baltimore S.S. Co. v. Philips,*
    274 U.S. 316 (1927) .......................................................................................................... 7

*Batson v. Powell,*
    912 F. Supp. 565 (D.D.C. 1996) .................................................................................... 10

*Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls,*
    536 U.S. 822 (2002) ........................................................................................................ 34

*Black Panther Party v. Smith,*
    661 F.2d 1243 (D.C. Cir. 1981) ..................................................................................... 10

*Bond v. United States,*
    529 U.S. 334 (2000) ........................................................................................................ 27

*Brown v. FBI,*
    793 F. Supp. 2d 368 (D.D.C. 2011) ....................................................................... passim

*Brown v. McHugh,*
    972 F. Supp. 2d 58 (D.D.C. 2013) ..................................................................... 44

*Chinn v. Giant Food, Inc.,*
    100 F. Supp. 2d 331 (D. Md. 2000) ................................................................... 8

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .......................................................................................... 21

*Clapper v. Amnesty Int'l,*
    133 S. Ct. 1138 (2013) ......................................................................... <u>passim</u>

*Clark v. Library of Congress,*
    750 F.2d 89 (D.C. Cir. 1984) .......................................................................... 23

*Coalition for Mercury-Free Drugs v. Sebelius,*
    671 F.3d 1275 (D.C. Cir. 2012) ..................................................................... 21

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................................ 11, 15

*Devlin v. Scardelletti,*
    536 U.S. 1 (2002) ............................................................................................ 11

*In re Directives,*
    551 F.3d 1004 (FISC-R 2008) ........................................................................ 34

*Doe by Fein v. Dist. of Columbia,*
    93 F.3d 861 (D.C. Cir. 1996) .......................................................................... 43

*Dorsey v. Holman,,*
    476 F. App'x 861 (D.C. Cir. 2012) ............................................................... 8, 9

*Edwards v. Aurora Loan Servs.,Inc.,*
    791 F. Supp. 2d 144 (D.D.C. 2011) ............................................................... 11

*Elkins v. Dist. of Columbia,*
    690 F.3d 554 (D.C. Cir. 2012) ....................................................................... 43

*FDIC v. Meyer,*
510 U.S. 471 (1994) ........................................................................................... 23

*General Elec. Co. v. Jackson,*
610 F.3d 110 (D.C. Cir. 2010) ..................................................................... 43, 44

*Gilbert v. Homar,*
520 U.S. 924 (1997) ........................................................................................... 44

*Gonzalez v. Freeman,*
334 F.2d 570 (D.C. Cir. 1964) .......................................................................... 44

*Gordon v. Warren Consol. Bd. of Educ.,*
706 F.2d 778 (6th Cir. 1983) ............................................................................ 39

*Graham v. Connor,*
490 U.S. 386 (1989) ........................................................................................... 42

*In re Grand Jury Proceedings,*
827 F.2d 301 (8th Cir. 1987) ............................................................................ 29

*Guest v. Leis,*
255 F.3d 325 (6th Cir. 2001) ............................................................................ 36

*Haig v. Agee,*
453 U.S. 280 (1981) ..................................................................................... 34, 44

*Harpole Architects, P.C. v. Barlow,*
668 F. Supp. 2d 68 (D.D.C. 2009) ............................................................. passim

*Harris v. Holder,*
885 F. Supp. 2d 390 (D.D.C. 2012) .................................................................. 42

*Holder v. Humanitarian Law Project,*
130 S. Ct. 2705 (2010) ...................................................................................... 45

*Horton v. California,*
496 U.S. 128 (1990) ........................................................................................... 18

*Howard v. Gutierrez,*
    474 F. Supp. 2d 41 (D.D.C. 2007) .................................................................. 10

*Jifry v. FAA,*
    370 F.3d 1174 (D.C. Cir. 2004) ...................................................................... 45

*Johnson v. Quander,*
    440 F.3d 489 (D.C. Cir. 2006) ...................................................................... 17

*Jones v. Horne,*
    634 F.3d 588 (D.C. Cir. 2011) ...................................................................... 24

*Katz v. United States,*
    389 U.S. 347 (1967) ...................................................................................... 26

*Klayman v. Obama,*
    957 F. Supp. 2d 1 (D.D.C. 2013) ............................................................. passim

*Koch v. Schapiro,*
    699 F. Supp. 2d 3 (D.D.C. 2010) .............................................................. 8, 10

*Krieger v. DOJ,*
    529 F. Supp. 2d 29 (D.D.C. 2008) ................................................................ 42

*Laird v. Tatum,*
    408 U.S. 1 (1972) ...................................................................................... passim

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................................. 11, 18

*Lyles v. Micenko,*
    468 F. Supp. 2d 68 (D.D.C. 2006) ................................................................ 43

*Maryland v. King,*
    133 S. Ct. 1958 (2013) .................................................................................. 34

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ...................................................................................... 44

*NTEU v. Von Raab,*
    489 U.S. 656 (1989) .................................................................................................. 33, 34

*Rakas v. Illinois,*
    439 U.S. 128 (1978) .......................................................................................................... 29

*Reporters Comm. for Freedom of the Press v. AT&T,*
    593 F.2d 1030 (D.C. Cir. 1978) ......................................................................... 27, 39, 40

*Scott v. United States,*
    436 U.S. 128 (1978) .......................................................................................................... 38

*SEC v. Jerry T. O'Brien, Inc.,*
    467 U.S. 735 (1984) .......................................................................................................... 28

*In re Sealed Case,*
    310 F.3d 717 (FISC-R 2002) .............................................................................. 33, 38, 44

*Simms v. Dist. of Columbia,*
    872 F. Supp. 2d 90 (D.D.C. 2012) .................................................................................. 43

*Smith v. Maryland,*
    442 U.S. 735 (1979) .................................................................................................. passim

*Stark v. Starr,*
    94 U.S. 477 (1876) .......................................................................................................... 7, 8

*Steagald v. United States,*
    451 U.S. 204 (1981) .......................................................................................................... 29

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................................................ 11

*Texas v. Brown,*
    460 U.S. 730 (1983) .......................................................................................................... 18

*Thomas v. Knight,*
    257 F. Supp. 2d 86 (D.D.C. 2003) .................................................................................. 10

*Tootle v. Sec'y of the Navy,*
    446 F.3d 167 (D.C. Cir. 2006) ....................................................................... 11

*United Presbyterian Church in the USA v. Reagan,*
    738 F.2d 1375 (D.C. Cir. 1984) .............................................................. 19, 22

*United States Telecom Ass'n v. FCC,*
    227 F.3d 450 (D.C. Cir. 2000) ................................................................ 26, 27

*United States v. Banks,*
    3 F.3d 399 (11th Cir. 1993) ......................................................................... 18

*United States v. Baxter,*
    492 F.2d 150 (9th Cir. 1973) ....................................................................... 27

*United States v. Bin Laden,*
    126 F. Supp. 2d 264 (S.D.N.Y. 2000) ......................................................... 37

*United States v. Christie,*
    624 F.3d 558 (3d Cir. 2010) ........................................................................ 36

United States v. Clutter,
    674 F.3d 980 (8th Cir. 2012) ....................................................................... 18

*United States v. Dionisio,*
    410 U.S. 1 (1973)........................................................................................ 29

*United States v. Doe,*
    537 F. Supp. 838 (E.D.N.Y. 1982) .............................................................. 27

*United States v. Figueroa,*
    757 F.2d 466 (2d Cir. 1985)......................................................................... 38

*United States v. Fithian,*
    452 F.2d 505 (9th Cir. 1971) ....................................................................... 27

*United States v. Forrester,*
    512 F.3d 500 (9th Cir. 2008)........................................................................ 36

*United States v. Jacobsen,*
  466 U.S. 109 (1984) ................................................................... 17, 18, 32

*United States v. Jones,*
  132 S. Ct. 945 (2012) ...................................................................... 26, 31

*United States v. Kahn,*
  415 U.S. 143 (1974) ................................................................................ 37

*United States v. Kennedy,*
  81 F. Supp. 2d 1103 (D. Kan. 2000) ...................................................... 36

*United States v. Licata,*
  761 F.2d 537 (9th Cir. 1985) .................................................................. 18

*United States v. Miller,*
  425 U.S. 435 (1976) ..................................................................... passim

*United States v. Moalin,*
  2013 WL 6079518 (S.D. Cal. Nov. 18, 2013) ................................... 24, 25

*United States v. Perrine,*
  518 F.3d 1196 (10th Cir. 2008) .............................................................. 36

*United States v. Place,*
  462 U.S. 696 (1983) ........................................................................ 17, 32

*United States v. Qing Li,*
  2008 WL 789899 (S.D. Cal. Mar. 20, 2008) ........................................... 36

*United States v. Reed,*
  575 F.3d 900 (9th Cir. 2009) .................................................................. 26

*United States v. Rigmaiden,*
  2013 WL 1932800 (D. Ariz. May 8, 2013) .............................................. 30

*United States v. U.S. Dist. Court, (Keith),*
  407 U.S. 297 (1972) ................................................................................ 33

*United States v. VanLeeuwen,*
    397 U.S. 249 (1970) ............................................................................. 18

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ............................................................................. 37

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) ....................................................................... 33, 34

*Zerilli v. Evening News Ass'n,*
    628 F.2d 217 (D.C. Cir. 1980) ............................................................. 8

*Zurcher v. Stanford Daily,*
    436 U.S. 547 (1978) ............................................................................. 39

**STATUTES AND RULES**

50 U.S.C. § 1801(h) ................................................................................... 38

50 U.S.C. § 1841(2) ..................................................................................... 4

50 U.S.C. § 1842 ....................................................................................... 20

50 U.S.C. § 1842(c)(2) .............................................................................. 40

50 U.S.C. § 1861 ................................................................................... 4, 40

50 U.S.C. § 1861(d)(1) .............................................................................. 45

50 U.S.C. § 1861(f)(2)(A)(i) ..................................................................... 45

50 U.S.C. § 1881a ....................................................................................... 4

50 U.S.C. § 1881a(a) and (b) .................................................................... 40

50 U.S.C. § 1881a(b)(1)-(3) ...................................................................... 22

50 U.S.C. § 1881a(h)(4), (6) ..................................................................... 45

50 U.S.C. §§ 1881a(a), (b) ........................................................................ 22

Fed. R. Civ. P. 25(d) ................................................................................... 1

L. Cv. R. 23.1 .................................................................................. 6, 7, 10

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 109-174 ............................................................................................................45

*Implementation of the USA PATRIOT Act: Hearing Before the H. Subcomm. on Crime,
    Terrorism, and Homeland Security, Comm. on the Judiciary*, 109th Cong. at 65
    (2005) ...........................................................................................................................45

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————  )
                                                              )
LARRY KLAYMAN, *et al.*,                        )
                                                              )
              Plaintiffs,                                )
                                                              )
        v.                                                   )          Civil Action No. 14-cv-00092 (RJL)
                                                              )
BARACK OBAMA, President of the           )
  United States, *et al.*,                             )
                                                              )
              Defendants.                              )
—————————————————————  )

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
### OF THE GOVERNMENT DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

This case is the third of three actions brought by Plaintiffs against the Government

Defendants[1] in which they challenge alleged intelligence-gathering activities.  The Court is

already thoroughly familiar with these related cases and their current procedural posture, and it

appreciates both the importance of the constitutional questions presented and the national

security interests at stake.  *See Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013).

In this putative class action, Plaintiffs allege violations of their constitutional rights

flowing from the National Security Agency (NSA's) bulk telephony metadata program; the

NSA's discontinued bulk Internet metadata program; and the NSA's targeted collection, under a

program known as "PRISM," of communications of non-U.S. persons reasonably believed to be

---

[1] The "Government Defendants" are Barack Obama, President of the United States, Eric
Holder, Attorney General of the United States, Admiral Michael S. Rogers, Director of the
National Security Agency (NSA), James Clapper, Director of National Intelligence (DNI), John
O. Brennan, Director of the Central Intelligence Agency (CIA), and James Comey, Director of
the Federal Bureau of Investigation (FBI), insofar as they are sued in their official capacities,
together with defendants NSA, FBI, CIA and the United States Department of Justice.  Pursuant
to Federal Rule of Civil Procedure 25(d), Admiral Rogers is automatically substituted as an
official-capacity defendant in place of former NSA Director General Keith B. Alexander.

located abroad.  Plaintiffs also purport to challenge the legality of an alleged intelligence

program that they refer to as "MUSCULAR."  As an initial matter, the Court should dismiss this

case on grounds of claim-splitting:  the complaint in this case is a near carbon copy of the

complaint in *Klayman v. Obama*, Civ. No. 13-0881 (*Klayman II*), overlaps substantially with the

complaint in *Klayman v. Obama*, Civ. No. 13-0851 (*Klayman I*), and can only be explained as an

attempt to evade the deadline under the Local Rules to move for class certification in those two

cases.  Plaintiffs cannot maintain more than one action involving the same subject matter at the

same time in the same court and against the same defendants.

Plaintiffs' complaint also should be dismissed for lack of subject-matter jurisdiction.

They have not alleged sufficient facts to demonstrate that information about their calls has been

acquired or reviewed by the NSA under the bulk telephony metadata program, and any fear they

might have that the NSA may in some way "misuse" data allegedly collected about their calls is

neither a cognizable injury nor fairly traceable to the program's actual operation.  Similarly,

Plaintiffs have not established that the NSA acquired or reviewed information about their

communications under the bulk Internet metadata program; nor can they seek prospective

injunctive relief when the program has been discontinued, and the collected data destroyed.  As

to PRISM collection of the communications of non-U.S. persons located abroad, this Court has

already ruled, on almost identical allegations, that Plaintiffs do not have standing to challenge

that program.  *Klayman*, 957 F. Supp. 2d at 8 n.6.  And Plaintiffs' vague and speculative

allegations about a claimed program they call "MUSCULAR" are also insufficient to confer

standing under Article III.

Each of the three constitutional claims Plaintiffs assert in their Complaint should also be

dismissed for failure to state a claim.  Plaintiffs' Fourth Amendment claims factually predicated

on the bulk telephony and Internet metadata programs fail as a matter of law, because under

*Smith v. Maryland*, 442 U.S. 735 (1979), Plaintiffs lack a protected privacy interest in communications metadata.  *Smith,* and the third-party doctrine on which it is based, remain the law today, and the factual differences between *Smith* and the telephony metadata program discussed by the Court in its preliminary injunction ruling are, respectfully, immaterial to the reasoning of *Smith*.  Even if there were a protected privacy interest in communications metadata, Plaintiffs have not adequately alleged an invasion of that interest through actual review of any information collected about their communications, and even if such a search occurred, the bulk metadata programs are (or were) reasonable, and therefore lawful, under Fourth Amendment "special needs" analysis.  As for Plaintiffs' Fourth Amendment challenge to the NSA's PRISM program, this program is targeted only at non-U.S. persons reasonably believed to be located overseas, not U.S. persons such as Plaintiffs, and, to the extent communications involving U.S. persons are incidentally collected, such incidental collection does not violate the Fourth Amendment.

Plaintiffs' First Amendment claim rests entirely on the speculative premise that the Government uses information it acquires to track their activities and interpersonal relationships, and should be dismissed primarily because good-faith intelligence gathering conducted in a manner consistent with the Fourth Amendment, without purpose to deter or punish protected speech or association, does not violate the First Amendment.  Plaintiffs' Fifth Amendment due process claim is duplicative of their Fourth Amendment claim, and fails for want of a constitutionally protected privacy interest; even assuming such an interest exists, it does not entitle Plaintiffs to notice of the Government's intelligence-gathering activities that could undermine the Government's compelling interest in identifying unknown terrorist operatives and preventing terrorist attacks.

For these reasons, discussed more fully below, Plaintiffs' complaint should be dismissed.

## BACKGROUND

### I.      STATUTORY AND PROGRAMMATIC BACKGROUND

Plaintiffs' various allegations implicate different provisions of the Foreign Intelligence

Surveillance Act (FISA).  The NSA collects bulk telephony metadata under authority of orders

issued by the Foreign Intelligence Surveillance Court (FISC) pursuant to FISA's "business

records" provision, 50 U.S.C. § 1861, as amended by Section 215 of the USA PATRIOT Act,

Pub. L. No. 107-56, 115 Stat. 272 (2001) (Section 215); the NSA's PRISM program is conducted

under Section 702 of FISA, enacted by the FISA Amendments Act of 2008, Pub. L. 110-261,

§ 101(a)(2), 122 Stat. 2436, codified at 50 U.S.C. § 1881a (Section 702); and the NSA's now

discontinued program of bulk acquisition of Internet metadata was conducted under FISA's pen

register and trap and trace provision, which authorizes the FISC, upon application by the

Government, to issue an order "approving the installation and use of a pen register or trap and

trace device" for purposes of gathering foreign intelligence.  50 U.S.C. § 1841(2).  The

Government Defendants incorporate herein by reference the description of these programs set

forth in the Government Defendants' Opposition to Plaintiffs' Motions for Preliminary

Injunctions (*Klayman I*, ECF No. 25) at 5–16, as well as the Government Defendants'

Opposition to Plaintiffs' Motion for Partial Summary Judgment (*id.*, ECF No. 117) at 5–7.

### II.     PLAINTIFFS' ALLEGATIONS IN THIS CASE (*KLAYMAN III*)

In Plaintiffs' Class Action Complaint (ECF No. 1) (the "Complaint"), five named

Plaintiffs, on behalf of themselves and a putative class, allege that the Defendants have

"conducted surveillance and intelligence-gathering programs" that violate the Plaintiffs' First,

Fourth, and Fifth Amendment rights.  Compl. ¶¶ 31, 52–72.  First, with respect to telephony

metadata, Plaintiffs allege that the Government "is collecting 'metadata' about every phone call

made or received by residents of the United States."  *Id.* ¶ 3.  According to Plaintiffs, the

4

information acquired includes the identity of each call's recipient, length, and location, *id.*, and gives the Government "a comprehensive record" of an individual's communications, public movements, and "familial, political, professional, religious, and intimate associations." *Id.*

Second, with respect to the now discontinued bulk Internet metadata program, Plaintiffs allege that the Government Defendants, "with the participation of certain telecommunications and internet companies," Compl. ¶ 31, engage in the "expansive acquisition" of Plaintiffs' "internet records" pursuant to "Section 215" of the FISA. *Id.* ¶ 1.

Third, Plaintiffs allege "a secret and illegal Government scheme to intercept and analyze vast quantities of communications from Internet and electronic service providers." *Id.* Specifically, Plaintiffs claim that the NSA uses "'PRISM,' . . . an internal Government computer system, authorized by Section 702 of [FISA]," "to manage domestic and foreign intelligence" collected from "records of all communications companies including Google, Yahoo!, Facebook, PalTalk, YouTube, Skype, AOL, and Apple, Verizon, AT&T, and Sprint." *Id.* ¶ 2.  Plaintiffs claim that the NSA and FBI acquire data, including the content of internet communications, "from the main computer servers of major U.S. Internet firms, including Microsoft (Hotmail, etc.), Google, Yahoo!, Facebook, PalTalk, YouTube, Skype, AOL, and Apple." *Id.* ¶ 7.

Finally, Plaintiffs refer to an alleged "Government program" they call "MUSCULAR," *id.* ¶¶ 8, 55, under which they claim "the FBI, CIA, and NSA have been intercepting information from internet companies such as Google and Yahoo! as it travels over fiber optic cables from one data center to another." *Id.* ¶ 8.  Plaintiffs allege no further facts about this program, and the Government has neither confirmed nor denied the existence of such a program.

Plaintiffs contend that these alleged NSA activities violate their rights under the First, Fourth, and Fifth Amendments.  *See id.* ¶¶ 52–72.  Plaintiffs, on behalf of themselves and a putative class, seek compensatory and actual damages, punitive damages, and attorneys' fees and

costs. *Id.* ¶ 73.  They also seek:  (1) a cease and desist order to enjoin the intelligence-gathering

activities alleged in the Complaint; (2) an order directing "that all Plaintiffs' and Class members'

phone, internet, and social media records and communication records, whether telephonic or

electronic, be returned to the provider and expunged from federal Government records"; and

(3) "a full disclosure and a complete accounting of what each Defendant as a whole has done and

allowed the DOJ, CIA, FBI, and NSA to do." *Id.* ¶ 74.

## III.    PROCEDURAL HISTORY

Plaintiff Klayman brought the first of Plaintiffs' actions challenging alleged NSA

intelligence-gathering activities on June 6, 2013.  Compl., *Klayman I*, ECF No. 1 ("*Klayman I*

Compl.").[2]  The initial complaint challenged the bulk acquisition of telephony metadata under

Section 215, and "reserve[d] the right" to convert that suit into a class action.  *Id.* at 13.[3]  Six

days later, Plaintiffs (Michael Ferrari and Matt Garrison, in addition to the *Klayman I* plaintiffs)

brought a second suit styled as a putative class action, challenging the telephony metadata

program, PRISM collection under Section 702, and the bulk acquisition of Internet metadata.

*See* Compl., *Klayman II*, ECF No. 1 ("*Klayman II* Complaint") ¶¶ 58–68.  Plaintiffs amended or

sought to amend the *Klayman I* and *Klayman II* complaints on multiple occasions, *see, e.g.*, Am.

Compl., *Klayman I*, ECF No. 77;  Mot. to Am. Compl., *Klayman II*, ECF No. 28, most recently

on February 10 and January 30, 2014, respectively, *see* Third Am. Compl., *Klayman I*, ECF No.

4; Mot. for Leave to File Second Am. Compl., *Klayman II*, ECF No. 55 (still pending).

Plaintiffs did not move for class certification in either *Klayman I* or *Klayman II*.  Instead,

27 and 21 days *after* the 90 days allowed by Local Civil Rule 23.1(b), respectively—and without

---

[2] Plaintiffs Charles and Mary Ann Strange were added in the Amended Complaint filed in
*Klayman I* on June 9, 2013 (ECF No. 4).

[3] The later-filed *Klayman II* Complaint referred to the *Klayman I* Complaint as a "Class
Action Complaint."  *Klayman II* Compl., Civ. No. 13-881, ECF No. 1 (June 12, 2013) ¶ 5.

acknowledging, much less explaining, their failure to comply with the rule—Plaintiffs filed motions for extensions of time to move for class certification.  *See* Mot. for Ext. of Time to Certify Class Action, *Klayman I*, ECF No. 7; Mot. for Ext. of Time to Certify Class Action, *Klayman II*, ECF No. 6.  Plaintiffs continued moving for extensions, *see, e.g.*, Mot. for Ext. of Time to Certify Class, *Klayman I*, ECF No. 14; Mot. for Ext. of Time to Certify Class, *Klayman II*, ECF No. 11, on which the Court did not rule.  Then—over four months after the Rule 23.1(b) deadline had passed in both cases—they submitted a "praecipe" stating that they would not be seeking certification in either case, but would instead file a separate suit "to streamline and expedite these two cases."  Pls.' Praecipe Regarding Class Actions, *Klayman I*, ECF No. 71, *Klayman II*, ECF No. 54.  Shortly thereafter, Plaintiffs filed the Complaint in this case, a near carbon-copy of the proposed Second Amended Complaint in *Klayman II*.  *See infra* at 8–10.

Plaintiffs moved for class certification in this action on March 25, 2014.  *See* Mot. for Certification of Class, ECF No. 6 (Mar. 25, 2014).  The Government Defendants sought to stay class certification proceedings in *Klayman III*, explaining that they would shortly be seeking dismissal of the action in the instant motion, *see* Mot. to Stay Class Certification Proceedings Pending Resolution of the Gov't Defendants' Rule 12(b) Mot., ECF No. 9 (Apr. 10, 2014), and submitted their opposition to Plaintiffs' motion for class certification on April 22, 2014, *see* Opp'n to Pls.' Mot. for Class Certification, ECF No. 12 (Apr. 22, 2014).

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED FOR VIOLATING THE RULE AGAINST CLAIM-SPLITTING.

This case should be dismissed as a textbook example of claim-splitting.  The rule against claim-splitting provides that a plaintiff "is not at liberty to split up his demand and prosecute it by piecemeal."  *Baltimore S.S. Co. v. Philips*, 274 U.S. 316, 320 (1927) (quoting *Stark v. Starr*,

7

94 U.S. 477, 485 (1876)); *see also Chinn v. Giant Food, Inc.*, 100 F. Supp. 2d 331, 333 (D. Md. 2000) ("The cases are legion that a party may not institute new actions duplicating existing litigation.") (collecting cases).  In short, a plaintiff has "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Dorsey v. Holman*, 476 F. App'x 861, 863 (D.C. Cir. 2012) (quoting *Zerilli v. Evening News Ass'n*, 628 F.2d 217, 222 (D.C. Cir. 1980));[4] *see also Koch v. Schapiro*, 699 F. Supp. 2d 3, 11–12 (D.D.C. 2010) (quoting *Zerilli*, dismissing allegations that "involve[d] the same subject matter as claims pending in [the plaintiff's first-filed suit]," even over plaintiff's objection that the new action covered a time period not addressed by the first).  Yet that is exactly what Plaintiffs have done here.

The Complaint restates the allegations and claims of the proposed Second Amended Complaint in *Klayman II* almost verbatim.  It is a suit by the same five named plaintiffs against the same eleven defendants, enumerating the same three causes of action based on the same allegations.  *Compare* Compl. ¶¶ 10–24 (listing the parties), 52–72 (setting forth three claims for relief), *with* Second Am. *Klayman II* Compl. ¶¶ 10, 18–31 (listing the same parties), 48–68 (setting forth the same three claims for relief).  Even the prayers for relief are nearly identical, demanding the same sum in damages in the putative class and individual cases ("an amount in excess of $20 billion U.S. dollars") and the same three forms of equitable relief.  *Compare* Compl. ¶¶ 73–74, *with* Second Am. *Klayman II* Compl. ¶¶ 69–70 (adding a request that the Court monitor the Defendants' compliance with the requested injunction).  The similarities

---

[4] In *Dorsey*, the Court of Appeals affirmed the dismissal of a second action because, although it added a new count and a new defendant, it "mirrored" an amended complaint that the district court had rejected as untimely in the same plaintiff's first-filed suit.  *See Dorsey*, 476 F. App'x at 863.  The Court of Appeals concluded "[t]he district court correctly held that [the plaintiff] may not have a second bite at the apple by repeating identical claims with . . . a putative new defendant."  *Id.*  Here, *Klayman III* is Plaintiffs' *third* bite at the apple, not including the numerous amendments they have sought to their complaints in *Klayman I* and *Klayman II*.

between the two complaints are too extensive to list; as the examples below demonstrate, the

complaints are nearly indistinguishable.

| ***Klayman III* Complaint** | **Second Amended *Klayman II* Complaint** |
|---|---|
| ¶ 1: This is an action for monetary, declaratory, equitable, and injunctive relief as a result of the U.S. Government's illegal and unconstitutional use of an electronic surveillance program in violation of the First, Fourth, and Fifth Amendments of the U.S. Constitution. | ¶ 1: This is an action for monetary, declaratory, equitable, and injunctive relief as a result of the U.S. Government's illegal and unconstitutional use of an electronic surveillance program in violation of the First, Fourth, and Fifth Amendments of the U.S. Constitution. |
| ¶ 7: Additionally, the NSA and the FBI reportedly siphoned personal data from the main computer servers of major U.S. Internet firms, including Microsoft (Hotmail, etc.), Google, Yahoo!, Facebook, PalTalk, YouTube, Skype, AOL, and Apple. | ¶ 7: Additionally, the NSA, CIA, and the FBI reportedly siphoned personal data from the main computer servers of major U.S. Internet firms, including Microsoft (Hotmail, etc.), Google, Yahoo!, Facebook, PalTalk, YouTube, Skype, AOL, and Apple. |
| ¶ 31: Defendants, through the NSA and CIA, and with the participation of certain telecommunications and internet companies, has conducted surveillance and intelligence-gathering programs that collect certain data about the telephone and internet activity of American citizens within the United States. | ¶ 38: Defendants, through the NSA and CIA, and with the participation of certain telecommunications and Internet companies, have conducted surveillance and intelligence-gathering programs that collect certain data about the telephone and Internet activity of American citizens within the United States. |
| ¶ 39: Such schemes by the Defendants in concert with the Government have subjected untold number of innocent people to the constant surveillance of Government agents. | ¶ 44: Such schemes by the Defendants have subjected untold numbers of innocent people to the constant surveillance of government agents. |
| ¶ 42: The risk and knowledge that Plaintiffs' telephonic, and internet conversations may be overheard, undoubtedly chills speech, in violation of Plaintiffs' First Amendment rights. | ¶ 47: The risk and knowledge that Plaintiffs' telephonic, and Internet conversations may be overheard, undoubtedly chills speech, in violation of Plaintiffs' First Amendment rights. |

The principal difference between these complaints lies in the Complaint's class action

allegations, *see* Compl. ¶¶ 43–51.[5]  But the only conceivable reason for Plaintiffs to file this

_____

[5] The Second Amended Complaint in *Klayman II* also contains allegations regarding the Plaintiffs' communications with foreign countries, which are not included in the Complaint here. *Compare* Second Am. *Klayman II* Compl. ¶¶ 11–20, *with Klayman III* Compl.  This detail does not meaningfully distinguish these two actions.  That the Plaintiffs decided to omit details from otherwise identical allegations in their second-filed action renders the second action no less a suit "involving the same subject matter at the same time in the same court and against the same defendant."  *Dorsey*, 476 F. App'x at 863.  In *Dorsey*, even a second suit that added a new count against a new defendant was not sufficiently different to survive a motion to dismiss.  *Id.*  In

action rather than pursuing the class action claims in either of their already pending cases—indeed, the reason hinted at in Plaintiffs' own praecipe, *supra* at 7—was to evade the application of Local Civil Rule 23.1(b).  That rule requires a plaintiff to move for class certification within ninety days of filing the complaint, *see* LCvR 23.1(b), and it has "been strictly applied in this Circuit," *Howard v. Gutierrez*, 474 F. Supp. 2d 41, 53 (D.D.C. 2007), *reconsideration denied by* 503 F. Supp. 392 (D.D.C. 2007), whether the plaintiffs failed to comply with the deadline by months or even days.  *See Black Panther Party v. Smith*, 661 F.2d 1243, 1279 (D.C. Cir. 1981), *vacated by mem. on other grounds sub nom. Moore v. Black Panther Party*, 458 U.S. 1118 (1982); *Thomas v. Knight*, 257 F. Supp. 2d 86, 91 n.5 (D.D.C. 2003); *Batson v. Powell*, 912 F. Supp. 565, 570–71 (D.D.C. 1996).  A plaintiff cannot sidestep this requirement by filing an amended complaint, which "would essentially render *the local rule* without its intended legal effect."  *Howard*, 474 F. Supp. 2d. at 55.

Plaintiffs here have filed the functional equivalent of an amended complaint by abandoning their earlier class action claims in *Klayman I* and *II*—over four months after failing to comply with the Rule 23.1(b) deadline, *see supra* at 7—and bringing a new suit restating the same claims against the same defendants as in *Klayman II*, except pled as a putative class action.  Although Plaintiffs' claim-splitting is impermissible regardless of their motivation, their evident purpose in bringing this suit—to sidestep the Rule 23.1(b) deadline to move for class certification in *Klayman I* and *II*—is further reason why this case should be dismissed.

## II.     PLAINTIFFS HAVE NOT ESTABLISHED THAT THIS COURT HAS JURISDICTION OVER ANY OF THEIR CLAIMS.

To present a case or controversy within the subject-matter jurisdiction conferred by Article III, parties seeking to bring suit in federal court must demonstrate that they have

---

*Koch*, a claim that covered a new timeframe also was not sufficient.  *See* 699 F. Supp. 2d at 11–12.  Here, Plaintiffs cannot claim even these minimal differences.

standing.  To establish Article III standing, Plaintiffs must seek relief from an injury that is

"concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and

redressable by a favorable ruling."  *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013).

Because standing is "an indispensable part of [a] plaintiff's case," *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 561 (1992), Plaintiffs, as the parties invoking federal jurisdiction, bear the burden

of establishing these three elements.  *Devlin v. Scardelletti*, 536 U.S. 1, 6–7 (2002).

When considering a motion to dismiss for lack of subject-matter jurisdiction, a

"plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1)

motion than resolving a 12(b)(6) motion for failure to state a claim."  *Edwards v. Aurora Loan*

*Servs., Inc.*, 791 F. Supp. 2d 144, 149 (D.D.C. 2011).  For example, "conclusory allegations of

injury are not the type of general factual allegations from which the Court may presume the

specific facts necessary to ensure that the plaintiff has standing, and are insufficient to meet the

plaintiff's burden of alleging an injury in fact that is concrete and particularized."  *Brown v. FBI*,

793 F. Supp. 2d 368, 378 (D.D.C. 2011).  In resolving the motion, however, the Court is not

limited to the allegations in the complaint, but "may look beyond the pleadings to resolve

disputed jurisdictional facts."  *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 174 (D.C. Cir. 2006).

Plaintiffs purport to challenge four NSA programs on the basis that they violate their

First, Fourth, and Fifth Amendment rights:  (1) the bulk acquisition of telephony metadata; (2)

the now discontinued acquisition of bulk Internet metadata; (3) the NSA's PRISM collection of

certain communications content; and (4) the collection of information under an alleged program

entitled "MUSCULAR."  Plaintiffs must "demonstrate standing for each claim [they] seek[] to

press."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  If Plaintiffs cannot carry

their threshold burden of establishing their standing, then "the [C]ourt cannot proceed" and must

dismiss the case.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

**A. Plaintiffs Lack Standing to Challenge the Bulk Telephony Metadata Program.**

**1. Plaintiffs' Fourth Amendment Claim**

Plaintiffs have failed to demonstrate that they have suffered a cognizable Fourth Amendment injury because they have not pled sufficient facts from which it can be concluded that records of their calls have been acquired or reviewed under the bulk telephony metadata program.  Plaintiffs Klayman and Charles and Mary Ann Strange allege that they are "subscribers" and "users" of "Verizon Communications," *see* Compl. ¶¶ 10–11, whereas Plaintiff Ferrari claims to be a "subscriber, consumer, and user of Sprint." *Id.* ¶ 12.  Plaintiff Garrison does not allege that he uses a telephone. *Id.* ¶ 13.  Plaintiffs claim that the "collection and production of . . . phone . . . records," *id.* ¶ 70, under the program constitute an "unreasonabl[e] search[] and seiz[ure]," *id.* ¶ 67, and that the acquisition of this metadata allows the NSA to "easily and indiscriminately build a comprehensive picture and profile of any individual." *Id.* ¶ 70.  Plaintiffs also allege that, after the NSA acquires metadata associated with their calls, it "continue[s] to search" Plaintiffs' "phone records" in violation of the Fourth Amendment, Compl. ¶ 67, and Plaintiff Klayman specifically alleges—without providing a basis for his "belief"—that the Government has "accessed [his] records." *Id.* ¶ 10.

As to the issue of collection, the Government Defendants recognize that this Court previously concluded that Plaintiffs Klayman and Charles Strange have standing to challenge the alleged acquisition of metadata about their telephone calls under the Section 215 program. *See Klayman*, 957 F. Supp. 2d at 26–29.  The Court inferred from the Government's explanation of the contact-chaining process that the NSA "*must* have collected metadata from Verizon Wireless . . . as well as AT&T and Sprint," if the program were to serve its intended function. *Id.* at 26–27.  The Government Defendants respectfully submit, however, that this conclusion is not supported and should not be followed here with regard to any of the Plaintiffs.

12

First, it cannot be assumed solely on the basis that Plaintiffs are subscribers to certain telecommunications companies that metadata about their calls have been produced to the NSA as part of the Section 215 program.  Except for a single, now-expired Secondary Order issued in April 2013 to Verizon Business Network Services, Inc., the Government has not declassified or otherwise acknowledged the identities of the carriers participating in the program either now, or at any other time.  *See* Decl. of Teresa H. Shea, Signals Intelligence Director, NSA, *Klayman I*, ECF No. 117-1 ("*Klayman* Shea Decl.") (attached as Exhibit A, hereto) ¶ 8.  The consequences of that gap in the record must befall Plaintiffs, as it is their "burden to prove their standing by pointing to specific facts, not the Government's burden to disprove standing by revealing details" of its intelligence programs.  *Amnesty Int'l*, 133 S. Ct. at 1149 n.4.

Moreover, the record now contains specific evidence refuting the inference underlying the Court's previous ruling.  As explained in the *Klayman* Shea Declaration, although the Government has acknowledged that the Section 215 program is broad in scope and involves the aggregation of an historical repository of data collected from more than one provider, the program has never captured information on all (or virtually all) telephone calls made and/or received in the United States.  *Klayman* Shea Decl. ¶ 8.  As the FISC itself observed in a decision last year, "[t]he production of all call detail records of all persons in the United States has never occurred under [the Section 215 telephony metadata] program."  *In re Application of the FBI for an Order Requiring the Production of Tangible Things from [Redacted]*, Dkt. No. BR 13-109 (Aug. 29, 2013) ("Aug. 29, 2013 FISC Op.") (attached as Exhibit B, hereto) at 4 n.5. It does not follow, therefore, that the NSA "must" collect metadata from all of the three "largest carriers" to perform its function, as the Court surmised, *Klayman*, 957 F. Supp. 2d at 27, and collection of metadata about Plaintiffs' calls cannot be presumed on the basis of that assumption.

Second, the Court should not continue to rely on its prior standing analysis because it is inconsistent with the Supreme Court's decision in *Amnesty International*.  There, various human rights, labor, and media organizations challenged the constitutionality of the FISA Amendments Act of 2008, which expanded the Government's authority to intercept the communications of non-U.S. persons located abroad.  133 S. Ct. at 1144.  The Court in *Amnesty International* insisted that these plaintiffs seeking judicial review of actions taken by the Government in the field of intelligence-gathering "set forth . . . specific facts demonstrating" that communications to which they were parties would be targeted for interception, and because the plaintiffs failed to do so, the Court dismissed their claims for lack of standing.  133 S. Ct. at 1149.  Notably, the majority declined to follow the approach advocated by the dissenting Justices, who, relying on "commonsense inferences," found a "very high likelihood" that the Government would intercept at least some of the plaintiffs' communications under the challenged statute.  *Id.* at 1157 (Breyer, J., dissenting).  The dissent based its conclusion on a combination of various facts, including that the plaintiffs regularly engaged in the type of electronic communications—with and about suspected foreign terrorists, their families and associates, and their activities—that the Government was authorized and highly motivated, for counter-terrorism purposes, to intercept, and that the record showed the Government had in fact intercepted on thousands of occasions in the past.  *Id.* at 1156–59.[6]

Akin to the dissent's approach in *Amnesty International*, this Court previously inferred, based on unclassified information about the general operation of the Section 215 program, that the NSA must have collected metadata about the Plaintiffs' calls (or, at the very least, metadata from Plaintiffs' provider), without the benefit of facts specific to Plaintiffs demonstrating that to

---

[6] The dissent also observed that the "Government [did] not deny that it ha[d] both the motive and the capacity to listen to communications of the kind described by [the] plaintiffs." 133 S. Ct. at 1159–60.

14

be the case.  The decision in *Amnesty International* teaches, however, that relying solely on inferences drawn from limited information about the scope and operation of the Government's intelligence-gathering activities, is not a sufficiently "rigorous" basis on which to find standing, at least in cases such as this where litigants seek to challenge the constitutionality of those activities.  *See* 133 S. Ct. at 1147.  Rather, to establish Plaintiffs' standing to challenge the acquisition of telephony metadata under the Section 215 program, the record must contain non-conclusory allegations of fact demonstrating that information about their communications has been or imminently will be collected under the program.  *See Brown,* 793 F. Supp. 2d at 378; *Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 78 (D.D.C. 2009).  As discussed above, Plaintiffs have made no such allegations.

Even presuming that records of Plaintiffs' calls have been collected under this program, Plaintiffs' allegations of "injury," that the NSA has reviewed the records associated with the calls, are speculative and conjectural, not actual or imminent, as Article III requires.  *Id.* at 1147; *see also DaimlerChrysler*, 547 U.S. at 345.  Under current FISC orders, NSA personnel may only review records responsive to queries initiated using selectors that the FISC has approved based on reasonable, articulable suspicion that they are associated with specific foreign terrorist organizations.  *In re Application of the FBI for an Order Requiring the Production of Tangible Things from [Redacted]*, Primary Order, Dkt. No. BR 13-80 (Apr. 25, 2013) ("Primary Order") (attached as Exhibit C, hereto) at 6–7; *Klayman I* Shea Decl. ¶¶ 3–5.  As a result, only a "tiny fraction" of the records is ever seen by any person.  Decl. of Teresa H. Shea, October 1, 2013 ("Shea Decl.") (attached as Exhibit D, hereto) ¶ 23.

Plaintiffs make no well-pleaded, non-conclusory allegations that the NSA has accessed or reviewed records of their calls—such as presenting a single factual allegation to support Plaintiff Klayman's "belief" that the NSA has accessed his records (Compl. ¶ 10)—as a result of queries

made under the "reasonable, articulable suspicion" standard (or otherwise).  Thus, it is sheer speculation to suggest that records of calls to or from Plaintiffs either have been or ever will be retrieved or reviewed as the result of queries, much less used to "build a comprehensive picture and profile" (Compl. ¶ 70) of Plaintiffs' contacts and associations.

The Supreme Court's decision in *Amnesty International* addressed a similar standing question and establishes that Plaintiffs' speculation concerning the scope and operation of the Section 215 program is insufficient to demonstrate their standing.  As noted, the plaintiffs in *Amnesty International* alleged that they interacted and engaged in sensitive communications with persons likely to be considered by the Government as potential terrorists, or persons of interest in terrorism investigations.  *See* 133 S. Ct. at 1145–46.  They further alleged they would suffer harms as a result of the Government surveillance program, including a compromised ability to "locate witnesses, cultivate sources, obtain information, and communicate confidential information," and a need to undertake various costly measures to avoid possible surveillance.  *Id.*

The Supreme Court, however, held that the plaintiffs' claimed injuries rested on a "speculative chain of possibilities," including "that the Government [would] target the communications of non-U.S. persons with whom they communicate," that it would succeed in intercepting them, and that the plaintiffs would be parties to the particular communications the Government intercepts.  *Id.* at 1148–50.  So, too, here.  The idea that the course of unspecified Government counter-terrorism investigations would lead, *e.g.,* to particular telephone numbers; that the FISC would approve use of these numbers to conduct queries of the database, based on reasonable, articulable suspicion that they are associated with foreign terrorist organizations; and that these queries would return records of Plaintiffs' calls that NSA analysts would in turn review (or misuse), is just as speculative as the allegations of harm that the Supreme Court rejected as insufficient in *Amnesty International*.

16

The Government Defendants recognize, however, that in ruling on Plaintiffs' request for preliminary relief in *Klayman I*, the Court concluded that Plaintiffs Klayman and Charles Strange had standing to challenge the alleged analysis of metadata pertaining to their calls, on the basis that when the NSA conducts queries, "its system must necessarily analyze metadata for *every* phone number in the database by comparing the foreign target number against *all* of the stored call records to determine which U.S. phones, if any, have interacted with the target number." *Klayman*, 957 F. Supp. 2d at 28. The Court concluded that such use "'implicates the Fourth Amendment each time a government official monitors it,'" in the same manner as Government monitoring of the hypothetical home video camera discussed in *Johnson v. Quander*, 440 F.3d 489 (D.C. Cir. 2006). *Id.* at 28–29 (quoting *Johnson*, 440 F.3d at 499). The analogy, however, is not apt.

The Court of Appeals explained in *Johnson* that an in-home video camera raises Fourth Amendment concerns each time it is monitored by a government official, because each time the camera reveals new and otherwise private information about the homeowner to that official. 440 F.3d at 498–99. The same cannot be said regarding queries of the bulk telephony metadata obtained under Section 215. As discussed above, when the NSA conducts a query, the analysts see no metadata associated with anyone's calls, and thus, the analysts learn no information about the communications of any individuals, unless their telephone numbers (or other identifiers) fall within two (previously three) "hops" of a suspected terrorist selector. *See* Shea Decl. ¶¶ 22–24; *Klayman* Shea Decl. ¶¶ 4–5. NSA's queries are more akin to the sniff of a narcotics-detection dog, which "discloses only the presence or absence of narcotics" in a person's luggage, and "does not expose noncontraband items that otherwise would remain hidden from public view, as does . . . an officer's rummaging through the [luggage's] contents." *United States v. Place*, 462 U.S. 696, 707 (1983) (holding that a canine sniff of luggage is not a search). *See also United*

*States v. Jacobsen*, 466 U.S. 109, 123 (1984) ("A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.").[7]

Therefore, absent some indication that analysts conducting queries, using selectors authorized by the FISC under the "reasonable, articulable suspicion" standard, have actually retrieved and reviewed records containing metadata associated with Plaintiffs' calls—and the Complaint contains no non-conclusory allegations to that effect—Plaintiffs cannot demonstrate that the query process itself constitutes an "*invasion* of a legally protected interest," *Defenders of Wildlife*, 504 U.S. at 560 (emphasis added), even assuming, *contra Smith v. Maryland*, 442 U.S. 735 (1979), that Plaintiffs have a protected privacy interest in telephony metadata.  *See Horton v. California*, 496 U.S. 128, 142 n.11 (1990) (government's acquisition of an item without examining its contents "does not compromise the interest in preserving the privacy of its contents"); *United States v. VanLeeuwen*, 397 U.S. 249, 253 (1970) (defendant's privacy interest in his detained first-class mail "not disturbed or invaded" until Government opened packages).[8]

---

[7] The Court's analogy of a library patron searching for every book that cites *Battle Cry of Freedom*, *Klayman*, 957 F. Supp. 2d at 28 n.38, is also distinguishable from the NSA's query process in the same critical respect.  In the Court's hypothetical, to find every book citing *Battle Cry of Freedom*, the patron herself reviews the contents of each book in the library.  In contrast, NSA analysts who conduct queries see no information contained in any call-detail records, except for the tiny fraction containing metadata within two hops of the suspected terrorist selector—as if the patron saw only those few books in the library that actually cite *Battle Cry of Freedom*.

[8] The Court described the above-cited passages from *Horton* and *VanLeeuwen* as dicta, *see Klayman*, 957 F. Supp. 2d at 29 n.40, but they are in fact statements of the law.  *See, e.g.*, *United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (seizure of computers, subsequently found to contain child pornography, did not implicate Fourth Amendment privacy interests at time seizure occurred); *United States v. Banks*, 3 F.3d 399, 401–02 (11th Cir. 1993) ("no Fourth Amendment privacy interest in first-class mail is invaded by detaining such mail . . . until a search warrant can be obtained," because "the privacy interest in the packages" was not disturbed); *United States v. Licata*, 761 F.2d 537, 541 (9th Cir. 1985) (seizure of a closed container "affects only the owner's possessory interests and not the privacy interests vested in the contents").  *See also Texas v. Brown*, 460 U.S. 730, 748–49 (1983) (Stevens, J., concurring in the judgment) (noting that seizure of a locked suitcase does not alone "compromise the secrecy of its contents" or "implicate any privacy interests").

In sum, Plaintiffs make no non-conclusory allegations demonstrating with the rigor required in this context, *Amnesty International*, 133 S. Ct. at 1147, 1149, that they have standing to contest the NSA's acquisition or querying of bulk telephony metadata under Section 215. Plaintiffs' claims that this program violates the Fourth Amendment therefore must be dismissed.

## 2. Plaintiffs' First and Fifth Amendment Claims[9]

Plaintiffs claim that the Section 215 program also "chill[s]" their speech and violates their "right of freedom of association by making them and others weary [*sic*] and fearful of contacting other persons via cell phone[] . . . out of fear of the misuse of Government power and retaliation against [those] persons and entities who challenge the misuse of Government power." *Id.* ¶¶ 60, 61. These allegations are insufficient to confer standing.

Regardless of whether the NSA acquires metadata associated with Plaintiffs' telephone calls (or even whether that data is returned as a result of a query), any "chill" on their First Amendment rights arising from a fear that the NSA will "misuse" metadata about their calls is speculative and subjective and thus is neither a cognizable injury nor fairly traceable to the actual operation of the challenged program. *See Amnesty Int'l*, 133 S. Ct. at 1152 (costs allegedly incurred to avoid possible surveillance was "product of" the plaintiffs' "fear of surveillance" and was "insufficient to create standing"); *Laird v. Tatum*, 408 U.S. 1, 10, 14 (1972) (holding that "[a]llegations of a subjective 'chill'" arising from plaintiffs' knowledge of the existence of government program were "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"); *United Presbyterian Church in the USA v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (chilling effect produced by fear of surveillance insufficient basis for standing under *Laird*); *ACLU v. Clapper*, 959 F. Supp. 2d 724, 736, 754

---

[9] For purposes of standing, Plaintiffs' Fifth Amendment claim is predicated on the same factual allegations as their First and Fourth Amendment claims.

(S.D.N.Y. 2013) (holding that "speculative fear" that "telephony metadata" would be "queried or reviewed" and the "identities of the telephone subscribers determined . . . 'relies on a highly attenuated chain of possibilities,'" which is "'insufficient to create standing'" for a First Amendment claim) (quoting *Amnesty Int'l*, 133 S. Ct. at 1148, 1152).

Accordingly, Plaintiffs' remaining claims challenging the Section 215 program should also be dismissed for lack of standing.

**B.  This Court Is Also Without Jurisdiction to Hear Plaintiffs' Challenge to the NSA's Discontinued Bulk Internet Metadata Program.**

Plaintiffs allege that the Government Defendants, "with the participation of certain telecommunications and internet companies," Compl. ¶ 31, engage in the "expansive acquisition" of Plaintiffs' "internet records" under the authority of "Section 215" of the FISA. *Id.* ¶ 1.  The Government has officially acknowledged the existence of a FISC-authorized program involving the acquisition and analysis, for foreign intelligence purposes, of non-content bulk Internet metadata (such as the "to" and "from" lines of an e-mail, and the date and time an e-mail was sent) carried out under the trap/trace provision of FISA, *see* 50 U.S.C. § 1842, not Section 215 as Plaintiffs assert.

The Court does not have jurisdiction to hear Plaintiffs' challenge to this program.  First, Plaintiffs can only speculate that Internet metadata associated with their communications were collected.  While the Government has declassified the program's existence and acknowledged that it acquired data in bulk and thus "on a very large scale," Report on NSA Bulk Collection under PATRIOT Act (attached as Exhibit E, hereto), at 3, the Government has not disclosed any other facts about the scope of the program or the sources from which metadata were acquired. Given that Plaintiffs set forth no non-conclusory allegations demonstrating that the NSA actually acquired Internet metadata about their communications, they have not established an injury-in-

fact sufficient to confer standing to challenge this program.  *See Amnesty Int'l*, 133 S. Ct. at

1146–50; *Brown,* 793 F. Supp. 2d at 378; *Harpole*, 668 F. Supp. 2d at 78.

Second, Plaintiffs lack standing to pursue any prospective injunctive relief (under any

constitutional theory) based on the NSA's bulk acquisition of Internet metadata.  Because this

program "was discontinued in 2011," *Klayman*, 957 F. Supp. 2d at 8 n.6,[10] more than two years

prior to this suit, this Court concluded that "there is no possible ongoing harm that could be

remedied by injunctive relief."  *Id.*  Thus, Plaintiffs do not have standing to seek this prospective

relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 105–06 (1983) (no standing to seek

prospective injunctive relief without a real and immediate threat of cognizable injury); *Coalition*

*for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279–80 (D.C. Cir. 2012) (same).[11]

### C.   Plaintiffs Do Not Have Standing to Challenge the NSA's PRISM Collection under Section 702 of the FISA.

Plaintiffs also allege that the NSA has a "classified surveillance program" known as

"PRISM," which they assert is an "internal Government computer system[] authorized by

Section 702" of the FISA, that "collects records of all communications companies" such as

"Google, Yahoo!, [and] Facebook," Complaint ¶ 2; they also allege that they are consumers,

subscribers, or users of these types of Internet-based communications services.  *See id.* ¶¶ 10–13.

But the PRISM collection to which Plaintiffs refer are acquisitions authorized pursuant to

Section 702 of the FISA, which permits the targeting of non-U.S. persons reasonably believed to

be located outside the United States in order to acquire foreign intelligence information; Section

702 does not authorize the bulk acquisition of communications.  *See* 50 U.S.C. §§ 1881a(a), (b);

---

[10] *See also* Letter from DNI Clapper to Sen. Ron Wyden (July 25, 2013) (attached as Exhibit F, hereto) at 3; Decl. of Teresa Shea (Mar. 17, 2014) (attached as Exhibit G, hereto) ¶ 34; Decl. of Miriam P. (May 9, 2014) (attached as Exhibit H, hereto) ¶ 21.

[11] Moreover, the remaining metadata collected under this program were destroyed at the time of the program's discontinuation.  Shea Decl. (Exh. G) ¶ 34.  Thus, the alleged maintenance of prior records would not afford any basis for standing for prospective relief.

*Klayman*, 957 F. Supp. 2d at 8 n.6; Oct. 3, 2011 FISC Op., 2011 WL 10945618, at *9 n.24; IC's

Collection Programs Under Title VII of the FISA (Exhibit H, hereto), at 3.

This Court has already ruled that Plaintiffs in *Klayman II*—on almost identical

allegations —did "not allege[] sufficient facts to show that the NSA has targeted" (or imminently

will target) "any of their communications" under Section 702 of FISA.  957 F. Supp. 2d at 8 n.6.

Here, Plaintiffs similarly fail to make any well-pled, non-conclusory allegations that the NSA

has actually targeted them or any communications of theirs (or of any non-U.S. persons with

whom they communicate) for foreign intelligence purposes authorized under Section 702.[12]  Nor

do they allege that their communications have been or will be acquired incidental to the targeting

of non-U.S. persons under Section 702.  *See* Oct. 3, 2011 FISC Op., 2011 WL 10945618, at *5.

Rather, Plaintiffs Klayman and Charles and Mary Ann Strange simply speculate that, "[o]n

information and belief," the Government has "accessed" their records.  Compl. ¶¶ 10–11.  Such

conclusory pleading does not satisfy the requirement of alleging injury that is concrete and

particularized.  *Brown,* 793 F. Supp. 2d at 378; *Harpole*, 668 F. Supp. 2d at 78.  Accordingly, so

far as Plaintiffs' claims are predicated upon alleged acquisition of their communications under

Section 702, they are foreclosed for lack of standing "as squarely dictated" by recent Supreme

Court precedent.  *Klayman*, 957 F. Supp. 2d at 8 n.6 (citing *Amnesty Int'l*, 133 S. Ct. at 1148-

50).[13]

---

[12] To the extent that Plaintiffs' allegations could be construed as suggesting that they (as opposed to non-U.S.-persons reasonably believed to be outside the United States) have been targeted under Section 702, the statute provides that U.S.-persons cannot be targeted.  *See* 50 U.S.C. § 1881a(b)(1)-(3); *see also Amnesty Int'l*, 133 S. Ct. at 1148.  And Plaintiffs allege no facts from which it could plausibly be concluded that the Government has targeted them in disregard of this prohibition, or that it would have any foreign intelligence reason for doing so.

[13] Given that the Complaint contains no well-pleaded, non-conclusory allegations that Plaintiffs have been targeted, their allegations that they "fear" their conversations will be "surveilled" and that this fear "chill[s]" their speech, Compl. ¶ 60, arises from Plaintiffs' knowledge of the existence of the program—rather than its operation with regard to Plaintiffs—

### D. Plaintiffs Lack Standing to Challenge an Alleged "MUSCULAR" Program.

Finally, the Court should dismiss Plaintiffs' constitutional claims for lack of standing, to the extent they are predicated upon a challenge to what Plaintiffs call "a Government program entitled 'MUSCULAR.'"  Compl. ¶ 8.  According to Plaintiffs, this "broad" (*id. ¶* 55) program allows "the FBI, CIA, and NSA [to] intercept[] information from internet companies such as Google and Yahoo! as it travels over fiber optic cables from one data center to another." *Id.* ¶ 8. Other than to allege that they are subscribers, users, or consumers of some or all of those Internet platforms, *see* Compl. ¶¶ 10–13, Plaintiffs plead no non-conclusory facts "demonstrating that [their] communications" have been acquired under this program, a necessary predicate to establish their standing.  *See Amnesty Int'l*, 133 S. Ct. at 1149; *Brown,* 793 F. Supp. 2d at 378; *Harpole*, 668 F. Supp. 2d at 78.  Nor can they do so.  The Government has not confirmed or denied the existence of an intelligence program named MUSCULAR, let alone any facts about the objectives, scope, or methods of operation of any such program.  Accordingly, Plaintiffs have "no actual knowledge" (*id.* at 1148) of the existence of the program, or, if it exists, its operation or scope; they are left to "merely speculate" (*id.* at 1148) about all of these matters, which is insufficient to confer standing under Article III.  *Id.* at 1147.[14]

---

and thus is not sufficient to confer standing.  *See Amnesty Int'l*, 133 S. Ct. at 1152; *Laird*, 408 U.S. at 10, 14; *United Presbyterian Church in the USA*, 738 F.2d at 1378.

[14]  Insofar as Plaintiffs mean to assert their $20 billion claims for *Bivens* damages against the Government Defendants, *see* Complaint ¶¶ 57, 64, 72, they must be dismissed on sovereign-immunity grounds.  The Government has not waived its sovereign immunity for *Bivens* claims against federal agencies or official-capacity defendants.  *See FDIC v. Meyer*, 510 U.S. 471, 484–86 (1994) (rejecting extension of *Bivens* to suits against federal agencies); *Clark v. Library of Congress*, 750 F.2d 89, 103 (D.C. Cir. 1984) ("Sovereign immunity . . . bar[s] suits for money damages against officials in their official capacity absent a specific waiver by the government.").

III.   **PLAINTIFFS' FOURTH, FIRST, AND FIFTH AMENDMENT CHALLENGES TO THE ALLEGED NSA INTELLIGENCE PROGRAMS FAIL AS A MATTER OF LAW.**

Plaintiffs fail to state legally sufficient claims that the NSA's bulk telephony metadata program, its discontinued bulk Internet metadata program, and its targeted PRISM collection of the communications of non-U.S. persons located abroad violate Plaintiffs' rights under the Fourth, First, and Fifth Amendments.[15]

**A.   Plaintiffs' Fourth Amendment Claim Fails as a Matter of Law.**

**1.   The Section 215 Telephony Metadata Program Does Not Violate Plaintiffs' Fourth Amendment Rights.**

Even if Plaintiffs could establish their standing, the legal foundation of their Fourth Amendment claim—that they have a reasonable expectation of privacy in the numbers dialed to connect a telephone call (and other metadata)—is foreclosed by *Smith v. Maryland*, 442 U.S. 735 (1979). That authority, and the third-party doctrine on which it is based, remain the law today. The factual differences between *Smith* and the telephony metadata program discussed by the Court in its preliminary injunction ruling are immaterial to the reasoning of *Smith*, as the FISC

---

[15] For the reasons stated in § II.D, above, Plaintiffs' two references to an alleged "MUSCULAR" program are too vague and conclusory to state a plausible claim upon which relief could be granted under any standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Similarly, there are no well-pleaded, non-conclusory allegations against the Central Intelligence Agency (CIA) or its Director, John Brennan (in his official capacity), indicating the role of the CIA in any of the challenged intelligence-gathering programs. Consequently, those defendants should be dismissed under *Iqbal*.

To avoid dismissal of their remaining claims under Rule 12(b)(6), Plaintiffs must show that their Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation omitted). Mere "labels and conclusions," and "naked assertion[s] devoid of further factual enhancement," *id.*, are not sufficient. Rather, considering only the well-pleaded, non-conclusory allegations of a complaint, and "assum[ing] their veracity," the Court must determine whether they "plausibly give rise to an entitlement to relief." *Id.* at 678–79 (internal quotations omitted). To reach the level of plausibility, the well-pleaded facts must demonstrate "'more than a sheer possibility that a defendant has acted unlawfully.'" *Jones v. Horne*, 634 F.3d 588, 596 (D.C. Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Facts "merely consistent with" a defendant's liability "stop[ ] short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678; *Jones*, 634 F.3d at 596.

24

recently explained in an opinion rejecting this Court's reasons for declining to follow *Smith*. *In re Application of the FBI for an Order Requiring the Prod. of Tangible Things*, Dkt. No. BR14-01, Op. and Order, 21–22 (FISC Mar. 20, 2014) ("Mar. 20, 2014 FISC Order") (Exhibit I, hereto); *see also ACLU*, 959 F. Supp. 2d at 752; *United States v. Moalin*, 2013 WL 6079518, at *5–8 (S.D. Cal. Nov. 18, 2013).  Even if there were a reasonable expectation of privacy in telephony metadata, contrary to *Smith*, Plaintiffs have not alleged an invasion of that interest, and the Section 215 telephony metadata program would pass constitutional muster in any event, as it is reasonable under the standard applicable to searches that serve special government needs. Thus, to the extent that Plaintiffs' Fourth Amendment claim is factually predicated on the Section 215 program, the claim must be dismissed.

### a. Under *Smith*, Plaintiffs have no protected privacy interest in telephony metadata.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  As an initial matter, the Government's acquisition of bulk telephony metadata, pursuant to orders of the FISC, does not constitute a "seizure" of Plaintiffs' records because the orders are directed to telecommunications service providers, not to subscribers, and direct the production of what are indisputably the providers' own business records.  *See* Shea Decl. ¶ 18; *Smith*, 442 U.S. at 741 (because the government ascertained the telephone numbers dialed from a telephone by installing equipment on telephone company property, the petitioner could not claim that his property was invaded); *United States v. Miller*, 425 U.S. 435, 440–41 (1976) (rejecting a bank depositor's Fourth Amendment challenge to a subpoena of bank records because, inasmuch as the bank was a party to the transactions, the records belonged to the bank); *ACLU*, 959 F. Supp. 2d at 751 (records obtained under the

Section 215 telephony metadata program are created and maintained by the telecommunications providers, not the plaintiff subscribers, and are not, therefore, the plaintiff's call records).

The NSA's bulk acquisition of telephony metadata is also not a "search."  The Fourth Amendment's proscription against unreasonable "searches" has been understood "for most of our history . . . to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates."  *United States v. Jones*, 132 S. Ct. 945, 949–50 (2012).  Since the decision in *Katz v. United States*, 389 U.S. 347 (1967), however, it has been understood that a Fourth Amendment "search" also takes place when governmental investigative activities "violate a person's 'reasonable expectation of privacy.'"  *Jones*, 132 S. Ct. at 949–50 (quoting *Katz*, 389 U.S. at 360).  In *Katz*, the Court held that the Government's interception of the contents of a telephone conversation occurring in a public telephone booth constituted a search under the Fourth Amendment.  *See Katz*, 389 U.S. at 353.  The Supreme Court squarely held in *Smith*, however, that individuals have no reasonable expectation of privacy in the mere telephone numbers they dial because they knowingly give that information to telephone companies when they dial the numbers; the government's acquisition of such numbers did not therefore constitute a search under the Fourth Amendment.  *Smith*, 442 U.S. at 741–46.[16]

In *Smith*, the police requested (without a warrant or court order) that the telephone company install a pen register device at its central offices to record the numbers dialed from a robbery suspect's (Smith's) home phone.  442 U.S. at 737.  After Smith was arrested, he sought to suppress evidence derived from the pen register as a violation of his Fourth Amendment

---

[16] Just as Plaintiffs voluntarily turn over the phone numbers they dial to their phone companies, they voluntarily turn over the dates, times, and durations of their calls; the telephone numbers from which incoming calls originate are also not protected by the Fourth Amendment. *See United States v. Reed*, 575 F.3d 900, 914 (9th Cir. 2009); *United States Telecom Ass'n v. FCC*, 227 F.3d 450, 454, 459 (D.C. Cir. 2000).  Other communications routing information collected under the program, such as trunk identifiers, is information collected or generated by the phone companies themselves.  *See* Primary Order, at 3 n.1.

rights.  Contrasting the collection of the numbers dialed with the acquisition of the contents of

communications at issue in *Katz*, *id.* at 741, the Court held that even if Smith harbored a

subjective expectation that the phone numbers he dialed would remain private, that expectation

was not reasonable.  The Court explained that it "consistently has held that a person has no

legitimate expectation of privacy in information he voluntarily turns over to third parties."

*Id.* at 743–44 (citing, *inter alia*, *Miller*, 425 U.S. at 441–43 (no reasonable expectation of privacy

in financial records a depositor voluntarily provided to his bank)).  Telephone users "typically

know that they must convey numerical information to the phone company; that the phone

company has facilities for recording this information; and that the phone company does in fact

record this information for a variety of legitimate business purposes." *Id.* at 743.[17]  By using his

phone, Smith "voluntarily conveyed numerical information to the telephone company and

'exposed' that information to its equipment in the ordinary course of business," and therefore

"assumed the risk that the company would reveal to police the numbers he dialed."  *Id.* at 744;

*see also id.* at 745; *Miller*, 425 U.S. at 443 ("depositor takes the risk, in revealing his affairs to

another, that the information will be conveyed by that person to the Government.").[18]

      *Smith* controls the instant case because the pen-register metadata at issue in *Smith* are

"indistinguishable" from the non-content telephony metadata at issue in the Section 215

program, and *Smith*'s rationale is fully applicable here.  *See* Mar. 20, 2014 FISC Order, at 11.

---

[17] As the FISC pointed out, "a telephone user who is making a call fully divulges to
the phone company the numbers he dials," unlike the bus passenger in *Bond v. United States*,
529 U.S. 334, 338 (2000), cited in *Klayman*, 957 F. Supp. 2d at 33 n.47, who sought to preserve
the privacy of the contents of his carry-on bag by using an opaque bag and placing that bag
directly above his seat.  *See* Mar. 20, 2014 FISC Order at 16 n.8.

[18] The third-party doctrine has consistently been applied to call detail records like the
records at issue here.  *See, e.g.*, *Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d
1030, 1043–46 (D.C. Cir. 1978); *United States v. Baxter*, 492 F.2d 150, 167 (9th Cir. 1973);
*United States v. Fithian*, 452 F.2d 505, 506 (9th Cir. 1971); *United States v. Doe*, 537 F. Supp.
838, 839–40 (E.D.N.Y. 1982).  *See also U.S. Telecom Ass'n*, 227 F.3d at 454 ("telephone
numbers are not protected by the Fourth Amendment") (citing *Smith*).

### b. *Smith* is not distinguishable from this case.

The Government Defendants respectfully submit, for the reasons explained herein, that *Smith* cannot be distinguished on the grounds the Court cited in its ruling on Plaintiffs' motion for a preliminary injunction in *Klayman I*.

First, the Section 215 telephony metadata program cannot be distinguished from *Smith* based on the more extensive collection and retention of metadata about each individual's calls. *See Klayman*, 957 F. Supp. 2d at 32. As the FISC observed, "*Smith* and the Supreme Court's other decisions applying the third-party disclosure principle make clear that . . . focus[ing on what happens to the data after it has been acquired] is misplaced in assessing whether the production of telephony metadata constitutes a search under the Fourth Amendment." Mar. 20, 2014 FISC Order at 15. "If a person who voluntarily discloses information can have no reasonable expectation concerning limits on how the recipient will use or handle the information, it necessarily follows that he or she also can harbor no such expectation with respect to how the Government will use or handle the information after it has been divulged by the recipient . . . regardless of how it might be later used by the recipient or the Government." *Id.* at 17; *see also SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984); *Smith*, 442 U.S. at 744; *Miller*, 425 U.S. at 443. Significantly *Miller*, on whose central holding *Smith* relied, upheld compelled production of almost four months of a person's bank records—a longer time than the three months in which production of telephony metadata is authorized—records that are more substantive and personal in nature than phone numbers, and more likely to reveal details about an individual's life than years' worth of telephony metadata. *See* Mar. 20, 2014 FISC Order at 21–22.

Second, perceived distinctions between the relationship of the government with the telephone company in *Smith*, and the relationship of the Government here with the companies that are compelled to produce telephony metadata under the program, do not justify departing

28

from *Smith*.  *See Klayman*, 957 F. Supp.2d at 32–33.  There is no support for the conclusion in

*Klayman* that the telecommunications companies that receive Section 215 orders are collecting

telephony metadata for law enforcement purposes, "operat[ing] what is effectively a joint

intelligence-gathering operation with the Government."  *Id.* at 33.  Rather, pursuant to the FISC's

orders, the companies "turn over to the NSA business records that the companies already

generate and maintain for their own pre-existing business purposes (such as billing and fraud

prevention)."  Shea Decl. ¶ 18.  *See also* Mar. 20, 2014 FISC Order at 18 n.9 (noting this Court's

acknowledgement that "the information produced to NSA consists of 'telephony metadata

records . . . *which the companies create as part of their business* of providing

telecommunications services to customers.'") (quoting *Klayman*, 957 F. Supp. 2d at 15).

     Third, this Court's emphasis on the program's alleged acquisition of data about the

communications of "hundreds of millions of people," *Klayman*, 957 F. Supp. 2d at 30, 33 &

n.48, 34, 36, is "misplaced under settled Supreme Court precedent."  Mar. 20, 2014 FISC Order,

at 19–20 & n.11.  Fourth Amendment rights "are personal in nature, and cannot bestow vicarious

protection on those who do not have a reasonable expectation of privacy in the place to be

searched."  *Steagald v. United States*, 451 U.S. 204, 219 (1981); *accord Rakas v. Illinois*, 439

U.S. 128, 133–34 (1978).  Thus, no Fourth Amendment interest of Plaintiffs is implicated by the

fact that metadata about many other individuals' calls are collected as well as (allegedly) their

own.  *United States v. Dionisio*, 410 U.S. 1, 13 (1973) (where single grand jury subpoena did not

constitute an unreasonable seizure, it was not "rendered unreasonable by the fact that many

others were subjected to the same compulsion"); *In re Grand Jury Proceedings*, 827 F.2d 301,

305 (8th Cir. 1987) ("[T]he fourth amendment does not necessarily prohibit the grand jury from

engaging in a 'dragnet' operation."); *ACLU*, 959 F. Supp. 2d at 752 ("The collection of

breathtaking amounts of information unprotected by the Fourth Amendment does not transform

that sweep into a Fourth Amendment search."); *United States v. Rigmaiden*, 2013 WL 1932800, at \*13 (D. Ariz. May 8, 2013) (Government did not violate Fourth Amendment by collecting a high volume (1.8 million) of IP addresses); Aug. 29, 2013 FISC Op. at 8–9.[19]

Fourth, the Court also suggested that individuals' decisions to voluntarily convey and expose their telephone numbers to their phone companies are a necessity of modern life that did not exist in 1979 when *Smith* was decided.  *See Klayman*, 957 F. Supp. 2d at 36.  But by 1979 the use of banks, credit cards, telephones, and the like was already prevalent, as both *Smith* and *Miller* demonstrate, and as the dissents in both cases expressly argued.  *See Smith,* 442 U.S. at 749–50 (Marshall, J., dissenting) (noting that phones have become a personal and professional necessity); *Miller*, 425 U.S. at 451 (Brennan, J., dissenting) (noting the necessity of having a bank account to participating in modern economic life); *see also ACLU*, 959 F. Supp. 2d at 749 n.16 (citing cases prior to 1979 holding no Fourth Amendment privacy interest in various information provided to third parties).

While it is true that cell phones did not exist in 1979, and that cell phones are used for purposes other than making telephone calls (such as accessing the Internet, taking pictures, and text messaging), *see Klayman*, 957 F. Supp. 2d at 34–35, "none of these additional functions generates any information that is being collected by NSA as part of the telephony metadata program, which . . . involves only non-content records concerning the placing and routing of telephone calls.  Accordingly, such changes are irrelevant . . . ."  Mar. 20, 2014 FISC Order at

---

[19]  Indeed, while the volume of data collected and retained about each individual's phone calls is greater here than in *Smith*, *Smith* implicated greater putative privacy concerns.  In *Smith*, the police *targeted* the phone calls of a single, known individual (Smith), in fact examined the data gathered to ascertain whether he had contacted another known individual (his victim), and used that information to arrest and prosecute him.  442 U.S. at 737.  The Court nonetheless ruled that Smith had no reasonable expectation of privacy in telephone numbers he dialed.  *Id*. at 741–42.  Here, by contrast, Plaintiffs can point to no equivalent putative intrusion on their privacy such as that metadata associated with their calls has been the subject or result of a query.

19; *see also ACLU*, 959 F. Supp. 2d at 752 ("Telephones have far more versatility now than when *Smith* was decided, but this case only concerns their use as telephones."); *Klayman*, 957 F. Supp. 2d at 35 (acknowledging that the types of information acquired under the telephony metadata program are "limited" to "phone numbers dialed, date, time, and the like").

Finally, *Jones* does not provide any basis for departing from the controlling authority of *Smith*. *See id.* at 36. As the FISC explained, the majority opinion in *Jones*, in holding that an individual has a protected Fourth Amendment interest against the police attaching a GPS tracker to his car, relied on the "physical intrusion" the tracker effected and "declined to address the question whether use of the GPS device, without the physical intrusion, impinged upon a reasonable expectation of privacy . . . ." Mar. 20, 2014 FISC Order at 25.[20] This Court relied on Justice Sotomayor's concurring opinion in *Jones* for the proposition that "the metadata from each person's phone 'reflects a wealth of detail about her familial, political, professional, religious, and sexual associations.'" *Klayman*, 957 F. Supp. 2d at 36 (citing *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring)).[21] But *Smith* itself recognized that a list of telephone numbers dialed "could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life," 442 U.S. at 748 (Stewart, J., dissenting), and yet the Court ruled that there is no reasonable expectation of privacy in telephone numbers dialed. *See also*

---

[20] Of course, the *Jones* majority opinion is controlling, and did not undermine the vitality of *Smith* in any way. "And the Supreme Court has instructed lower courts not to predict whether it would overrule a precedent even if its reasoning has been supplanted by later cases" (which has not occurred here). *ACLU*, 959 F. Supp. 2d at 752 (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

[21] Although Justice Sotomayor also stated in her concurring opinion that it may be necessary to reconsider the third-party doctrine, which she posited is ill-suited to the digital age, she expressly concluded that "[r]esolution of these difficult questions in this case is unnecessary, however, because the Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision." *Jones*, 132 S. Ct. at 957. *See also* Mar. 20, 2014 FISC Order at 28.

*Miller*, 425 U.S. at 451 (Brennan, J., dissenting) ("the totality of bank records provides a virtual current biography.").

Thus, *Smith* compels the conclusion that the alleged acquisition of bulk telephony metadata about Plaintiffs' telephone calls does not constitute a search for purposes of the Fourth Amendment, thereby ending the Fourth Amendment inquiry.

> **c.  Even if Plaintiffs had a reasonable expectation of privacy in telephony metadata about their calls, they have not shown that an invasion of that interest has occurred.**

Even if there were a reasonable expectation of privacy in telephony metadata, call detail records are not "searched" in a constitutional sense, *see Klayman*, 957 F. Supp. 2d at 29–30, every time NSA conducts a query.  When such queries are conducted, the only information made available for review by human beings are the records within two hops of the suspected terrorist selectors used to initiate the queries.  NSA analysts receive no information about the calls of any other individuals.  *See* Shea Decl. ¶¶ 20–23; *Klayman* Shea Decl. ¶¶ 3–5.  Thus, as discussed above, the query process is analogous, in Fourth Amendment terms, to a canine sniff to ascertain "the presence or absence of narcotics" in a person's luggage, which the Supreme Court has held does not constitute a search because it "does not expose noncontraband items that otherwise would remain hidden from public view."  *Place*, 462 U.S. at 707; *see also Jacobsen*, 466 U.S. at 123 (chemical test that only reveals to law enforcement officials whether a particular substance is cocaine does not compromise any legitimate interest in privacy).

Because Plaintiffs have not made any non-conclusory allegations that information associated with any of their phone calls has been reviewed by analysts in response to queries of the bulk telephony metadata produced to the NSA, they cannot maintain that NSA queries intrude upon any putative expectation of privacy they claim to have in that information. Thus no Fourth Amendment "search" of which they can complain has occurred.

### d.   The telephony metadata program is reasonable.

Even if the operation of the Section 215 telephony metadata program constitutes a "search" as to Plaintiffs, the Fourth Amendment bars only "unreasonable" searches and seizures, and this program is reasonable under the standard applied to assess suspicionless searches that serve special government needs.  *See* FISC Op. on PR/TT (attached as Exhibit J, hereto) at 51–52 (bulk metadata program serves special government needs).  As the Supreme Court has explained, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."  *NTEU v. Von Raab*, 489 U.S. 656, 665–66 (1989).  More specifically, the scope of the privacy interest and the character of the intrusion are balanced against the nature of the government interests to be furthered, the immediacy of the government's concerns regarding those interests, and the efficacy of the program in addressing those concerns.  *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 658, 660, 662–63 (1995).

The Section 215 telephony metadata program serves special governmental needs above and beyond normal law enforcement.  The program's undisputed purpose is identifying unknown terrorist operatives and preventing terrorist attacks, *see* Shea Decl. ¶¶ 8, 10—a forward-looking goal that fundamentally differs from most ordinary criminal law enforcement, which typically focuses on solving crimes that have already occurred, not preventing unlawful activity and protecting public safety and national security.  *See, e.g.*, *United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 322–23 (1972); *In re Sealed Case*, 310 F.3d 717, 746 (FISC-R 2002).

If, contrary to *Smith*, Plaintiffs could be said to have any Fourth Amendment privacy interest that is implicated by the mere acquisition of non-content telephony metadata, that

33

interest would be minimal.[22]   The intrusion on that interest, if any, is mitigated by the statutorily mandated restrictions on review and dissemination of the metadata that are written into the FISC's orders.  *See* Primary Order at 4–14.  *See also Maryland v. King*, 133 S. Ct. 1958, 1979 (2013); *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 833 (2002); *Vernonia Sch. Dist.*, 515 U.S. at 658.

On the other side of the balance, the acquisition and review of telephony metadata promote overriding public interests.  The interest in identifying and tracking terrorist operatives to prevent terrorist attacks is a national security concern of overwhelming importance.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation.") (internal quotation marks omitted); *In re Directives*, 551 F.3d 1004, 1012 (FISC-R 2008) (Government interest in national security "is of the highest order of magnitude."); *Klayman*, 957 F. Supp. 2d at 43 ("accept[ing] without question" the "proposition" that "the public's interest in combating terrorism is of paramount importance"); *ACLU*, 959 F. Supp. 2d at 754.  That interest cannot be as effectively achieved by conditioning access to telephony metadata on individualized suspicion, because such a requirement would not permit the type of historical analysis, contact-chaining, and timely identification of terrorist contacts that the program makes possible.  *See* Shea Decl. ¶¶ 44–63; *see also* Aug. 29, 2013 FISC Op. at 20–22; *ACLU*, 959 F. Supp. 2d at 747–48.  Imposing an individualized suspicion requirement is not only "impracticable" but may also be entirely infeasible.  *See Von Raab*, 489 U.S. at 665–66.

The Government respectfully disagrees with the Court's conclusions regarding the efficacy of the program.  *Klayman*, 957 F. Supp. 2d at 40–41.  The ability to quickly analyze past

---

[22] The Government Defendants respectfully disagree with the Court's conclusion that Plaintiffs have "a very significant expectation of privacy" in telephony metadata, *Klayman*, 957 F. Supp. 2d at 39, or, absent evidence that data pertaining to their calls have ever been reviewed by NSA analysts, that the program has infringed on any such expectation.

connections and chains of communication to determine terrorist connections can be critical in the midst of an active terrorism investigation.  *See id.* at 39–40 ("A closer examination of the record . . . reveals that the Government's interest is a bit more nuanced—it is not merely to investigate potential terrorists, but rather, to do so *faster* than other investigative methods might allow.").  Moreover, as the court in *ACLU* found, "[t]he effectiveness of bulk telephony metadata collection cannot be seriously disputed.  Offering examples is a dangerous stratagem for the Government because it discloses means and methods of intelligence gathering.  Such disclosures can only educate America's enemies.  Nevertheless, the Government has acknowledged several successes in Congressional testimony and in declarations that are part of the record in this case."  *ACLU*, 959 F. Supp. 2d at 755.

As a result, even if the Court were to find that a Fourth Amendment search had occurred with regard to the acquisition and/or querying of metadata associated with Plaintiffs' calls, such a search would be reasonable under the special needs doctrine.

### 2.    The NSA's Discontinued Bulk Collection of Internet Metadata Did Not Violate Plaintiffs' Fourth Amendment Rights.

Plaintiffs' claim that the NSA's discontinued bulk acquisition of Internet metadata program violated their Fourth Amendment rights likewise fails on the merits because individuals have no reasonable expectation of privacy in Internet metadata.  The FISC, in analyzing the very issue presented here, concluded that the "same analysis" the Supreme Court used in *Smith* applies to this type of bulk acquisition because "[u]sers of e-mail . . . voluntarily expose addressing information for communications they send and receive to communications service providers."  FISC Op. on PR/TT, at 60.  And, "[h]aving done so, they lack any legitimate expectation of privacy in such information for Fourth Amendment purposes."  *Id.*

Other courts have also concluded, based on the same rationale, that the acquisition of non-content Internet metadata does not implicate an individual's reasonable expectation of privacy. *See United States v. Christie*, 624 F.3d 558, 573 (3d Cir. 2010) ("Federal courts have uniformly held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation because it is voluntarily conveyed to third parties."); *United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008) (same); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (finding the use of a pen register to obtain data such as the to/from addresses of email messages to be "constitutionally indistinguishable from the use of a pen register that the Court approved in *Smith*").[23]

Moreover, because Plaintiffs have not made any non-conclusory allegations that metadata associated with any of their online communications, even if collected, were ever reviewed by analysts following queries of the database amassed under this program, *see* FISC Op. on PR/TT at 40–45, 51, they cannot claim an intrusion upon any putative expectation of privacy in that information. *See* § III.A.1.c, above.[24]

 Thus, even if Plaintiffs could establish that this Court has jurisdiction to hear their challenge to the discontinued Internet metadata program, their claim fails as a matter of law.

---

[23] *See also Guest v. Leis*, 255 F.3d 325, 335-36 (6th Cir. 2001) (users of computer bulletin board service lacked reasonable expectation of privacy in subscriber information they provided to systems operator); *In re Application of the U.S. for an Order Pursuant to 18 U.S.C. § 2703(d)*, 830 F. Supp. 2d 114, 131–38 (E.D. Va. 2011); (Internet protocol ("IP") address information); *United States v. Qing Li*, 2008 WL 789899, at *4–5 (S.D. Cal. Mar. 20, 2008) (IP log-in histories and addressing information); *In re Application of the United States*, 830 F. Supp. 2d 114, 133-38 (E.D. Va. 2011) (IP addresses); *United States v. Kennedy*, 81 F. Supp. 2d 1103, 1110 (D. Kan. 2000) (Internet subscriber information).

[24] Also, even if, contrary to *Smith* and its progeny, this Court finds the acquisition of bulk Internet metadata constituted a search under the Fourth Amendment, the search would have been reasonable under the special needs doctrine. *See supra* at 34–36; FISC Op. on PR/TT at 50–54.

### 3. The NSA's PRISM Collection under Section 702 of FISA Does Not Violate Plaintiffs' Fourth Amendment Rights.

The Government Defendants (and the Court) have already explained why Plaintiffs' claims that are predicated on their challenge to the NSA's Section 702 PRISM collection must fail for lack of standing. *See Klayman*, 957 F. Supp. 2d at 8 n.6. But, even if they could clear this jurisdictional hurdle, their Fourth Amendment claim would still fail.

Under Section 702, the NSA may target only non-U.S. persons believed to be located outside the United States, to whom the protections of the Fourth Amendment do not extend. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271, 275 (1990) (holding that "the Fourth Amendment has no application" to non-resident aliens with no "significant voluntary connection with the Unites States"). To the extent Plaintiffs' claim is that their communications were collected incidentally under the PRISM collection, the "incidental interception of a person's conversations during an otherwise lawful surveillance is not violative of the Fourth Amendment." *United States v. Bin Laden*, 126 F. Supp. 2d 264, 280 (S.D.N.Y. 2000) (citing, *inter alia*, *United States v. Kahn*, 415 U.S. 143, 157 (1974) (holding that interception of wife's communications incident to lawful wiretap targeting husband's communications did not violate the Fourth Amendment)). If it were otherwise, virtually all surveillance of foreign targets abroad would require a warrant, because there is almost always the possibility that a foreign target may communicate with a U.S. person.

Moreover, were any of Plaintiffs' communications incidentally intercepted under this program, minimization procedures approved and overseen by the FISC under Section 702 exist to protect their privacy interests in those communications. By definition, such minimization procedures must be reasonably designed to minimize the acquisition and retention, and to prohibit the dissemination, of private information concerning U.S. persons, to the extent

consistent with the Government's need to obtain, produce, and disseminate foreign intelligence information.  *See, e.g.*, 50 U.S.C. § 1801(h).  In other words, such procedures by design aim to ensure that any intrusion on the privacy of U.S. persons is reasonably balanced against governmental intelligence needs.  Such minimization procedures have been held constitutionally sufficient to protect third-parties in the domestic law enforcement context.  *See, e.g.*, *United States v. Figueroa*, 757 F.2d 466, 471 (2d Cir. 1985) ("Innocent parties are protected from unreasonable surveillance by the requirement contained in [the federal wiretap statute] that surveillance 'shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.'") (citing *Scott v. United States*, 436 U.S. 128, 130–31 (1978)).  This conclusion applies fully—if not more forcefully—in the foreign intelligence context.  *See, e.g.*, *In re Sealed Case*, 310 F.3d at 740–41 (FISA's requirement of minimization procedures supports statute's reasonableness).

Additionally, foreign-intelligence gathering serves a purpose beyond the normal need for law enforcement and therefore comes within the special governmental needs exception to the warrant requirement.  As the FISC Court of Review has held, the Government's "programmatic purpose" in obtaining foreign intelligence information is "to protect the nation against terrorist and espionage threats directed by foreign powers—'a special need' that fundamentally differs from 'ordinary crime control.'"  *Id.* at 717.  And, more specifically, the FISC "has previously concluded that the acquisition of foreign intelligence information pursuant to Section 702 falls within the 'foreign intelligence exception' to the warrant requirement of the Fourth Amendment."  Oct. 3, 2011 FISC Op., 2011 WL 10945618, at *24.

Finally, monitoring foreign targets located overseas under Section 702 is critical to protecting against foreign threats to national security and thus serves governmental interests of the highest order.  Balanced against these important interests are the privacy interests of U.S.

38

persons whose communications may be collected incidentally, but, as discussed above, any such interests are adequately protected by Section 702's minimization procedures.  The safeguards built into the statute provide reasonable assurance that the surveillance it authorizes will target only foreign persons outside the United States and will be conducted in a way that minimally affects the privacy of U.S. persons.  The Fourth Amendment requires no more.

### B.  Plaintiffs' First Amendment Claim Fails as a Matter of Law.

#### 1.  Good-Faith Investigatory Conduct Not Intended to Deter or Punish Protected Speech or Association Does Not Violate the First Amendment.

Plaintiffs' First Amendment claim, that the challenged intelligence-gathering programs violate their freedom of speech and association, Compl. ¶¶ 60–61, perishes in the wake of their failed Fourth Amendment claim.  Recognizing the need to accommodate the Government's interests where prevention of crime or, even more imperatively, potential threats to national security are concerned, *see ACLU Found. v. Barr*, 952 F.2d 457, 471 (D.C. Cir. 1991), courts distinguish for purposes of First Amendment analysis between government investigations that may have the incidental effect of deterring First Amendment activity, and concrete government action of a regulatory, proscriptive, or compulsory nature that is directed against individuals based on their expressive or associational activities.  *See Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978); *Laird*, 408 U.S. at 11; *Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1051–53 (D.C. Cir. 1978); *see also* FISC Op. on PR/TT at 66–67.

Accordingly, the law is clear that good faith governmental investigations conducted in observance of Fourth Amendment requirements, without the purpose to deter or penalize protected expression or association, do not violate the First Amendment.  *See Reporters Comm.*, 593 F.2d at 1051–53; *see also Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778, 781 n.3 (6th Cir. 1983) (collecting cases) ("[S]urveillance consistent with Fourth Amendment protections

. . . does not violate First Amendment rights, even though it may be directed at communicative or associative activities."), *quoted in ACLU*, 959 F. Supp. 2d at 753 (concluding that "[t]he Government's argument is well-supported" in this regard).  As the Court of Appeals explained in *Reporters Committee*, the First Amendment protects activities "*subject to* the general and incidental burdens that arise from good faith enforcement of otherwise valid criminal and civil laws that are not themselves solely directed" at First Amendment conduct.  593 F.2d at 1051.[25]

Here, Plaintiffs have not alleged that the challenged programs involving bulk metadata or targeted collection have any objective other than furthering the compelling national interest in identifying and tracking terrorist operatives and ultimately thwarting terrorist attacks.  *See* Compl. ¶¶ 2, 4, 33–35 (quoting Secondary Order at 2), *and id.* ¶¶ 36–38, 59–61.  The Complaint contains no allegations from which it could plausibly be concluded that the programs are (or were) aimed at curtailing any First Amendment expressive or associational activities.  *See id.*  As to the challenged bulk metadata programs, such collections are (or were) broad-based and undertaken without reference to anyone's conduct protected by the First Amendment.[26]  With respect to the only targeted collection that takes place under PRISM, Plaintiffs fail to plausibly allege that their communications have been targeted or acquired under Section 702, which is directed at non-U.S. persons located outside the United States and expressly prohibits the targeting of U.S. persons such as Plaintiffs.  50 U.S.C. § 1881a(a) and (b).  Nor do Plaintiffs

---

[25]  And, as the *ACLU* court recently found, this "consideration is built in to any section 215 application."  *Id.* (citing 50 U.S.C. § 1861) (requiring that the investigation not be conducted "solely upon the basis of activities protected by the [F]irst [A]mendment"); *see also* FISC Op. on PR/TT at 55–56 (highlighting similar certification requirements with respect to the (now discontinued) bulk Internet metadata collection program) (quoting 50 U.S.C. § 1842(c)(2)), *and id.* at 68 (holding that the national-security interest of the program, which is "not aimed at curtailing First Amendment activities[,] satisfies the 'good faith' requirement described in [*Reporters Committee*].").

[26]  Plaintiffs' allegations regarding the alleged breadth of the bulk metadata collections, *see* Compl. ¶¶ 2, 4, 33–38, 59–61, underscore this point.  Furthermore, as noted above, numerous safeguards built into those programs prevent (or prevented) the Government from collecting or using the data for purposes forbidden by the First Amendment.  *See supra* n.25.

allege, plausibly or otherwise, that they communicate with non-U.S. persons located abroad who have been targeted under PRISM, so as to make even incidental collection of Plaintiffs' communications possible.  *See supra* Section II.C.

### 2. The Challenged Programs Impose No Direct or Substantial Burden, or Chilling Effect, on Plaintiffs' Expressive or Associational Rights.

The underlying premise of Plaintiffs' First Amendment claim—that the challenged intelligence programs expose to Government scrutiny all of Plaintiffs' "associations, speech, and public movements," Compl. ¶ 3—is without foundation.  The Complaint contains no specific allegations from which it could plausibly be concluded that metadata acquired pursuant to FISA related to any of their communications (which do not include the names or addresses of anyone with whom Plaintiffs speak by phone) have ever been reviewed by NSA analysts for any purpose, whether as the results of queries based on the "reasonable, articulable suspicion" standard, or otherwise.  *See also ACLU*, 959 F. Supp. 2d at 753 ("[B]ulk metadata collection does not burden First Amendment rights substantially."); FISC Op. on PR/TT at 68–69 (concluding that the collection of bulk Internet metadata does not violate the First Amendment).  Nor have Plaintiffs alleged that they communicate with non-U.S. persons located overseas who are targets of Section 702 collection, let alone set forth a single, concrete example of communications of theirs that have been targeted or incidentally collected under Section 702.

Nor, for similar reasons, have Plaintiffs plausibly alleged a "chilling effect" causally connected to the challenged programs that interferes with their First Amendment rights of speech or association.  Plaintiffs speculate that, based on media revelations concerning the challenged programs, Compl. ¶¶ 5–8, 41, the "risk and knowledge that Plaintiffs' telephonic[] and internet conversations may be overheard . . . undoubtedly chills speech," *id.* ¶ 42, as it "instill[s] in Plaintiffs . . . and over a hundred million . . . Americans the fear that [such] conversations . . . are

in effect surveilled, tapped, and illegally surveyed," *id. ¶* 60.  *See also id.* ¶ 61 (similarly alleging

"fear of the misuse of Government power and retaliation").  But "[f]ear that telephony metadata

relating to [Plaintiffs] will be queried or reviewed or further investigated 'relies on a highly

attenuated chain of possibilities'" which is "insufficient to . . . establish a violation of an

individual's First Amendment rights."  *ACLU*, 959 F. Supp. 2d at 754 (quoting *Amnesty Int'l*,

133 S. Ct. at 1148, 1152); *see also Laird*, 408 U.S. at 10, 14.  Moreover, Plaintiffs fail to identify

an actual chill on speech or associational activity as required to support a First Amendment

claim.  *See Harris v. Holder*, 885 F. Supp. 2d 390, 400 (D.D.C. 2012) ("Where a party can show

no change in [his] behavior, [he] has quite plainly shown no chilling of [his] First Amendment

right to free speech.") (citation omitted); *Krieger v. DOJ*, 529 F. Supp. 2d 29, 58 (D.D.C. 2008).

Accordingly, Plaintiffs have failed to state a First Amendment claim that plausibly gives

rise to an entitlement to relief.  *Iqbal*, 556 U.S. at 678–79.

### C.   Plaintiffs Fail to State Due Process Claims under the Fifth Amendment.

### 1.   Plaintiffs' Substantive Due Process Claim Should Be Dismissed as Duplicative of Their Fourth Amendment Claim.

Plaintiffs' substantive due process claim is premised on an alleged liberty interest in

"personal security and in being free from the Defendants' use of unnecessary and excessive force

or intrusion against [their] person[s]."  Compl. ¶ 53.[27]  However, "[w]here a particular

Amendment 'provides an explicit textual source of constitutional protection' against a particular

sort of government behavior, 'that Amendment, not the more generalized notion of "substantive

due process," must be the guide for analyzing' these claims."  *Albright v. Oliver*, 510 U.S. 266,

273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Because Plaintiffs ground

---

[27]  Plaintiffs' Fifth Amendment claim does not include a challenge to the Section 215 telephony metadata program.  *See* Compl. ¶ 55.  Nevertheless, because the following Fifth Amendment analyses would be the same, even had Plaintiffs included Section 215 in their due process argument, the Government Defendants include references to Section 215 where relevant.

their substantive due process claim on privacy interests allegedly protected by the Fourth

Amendment, the Fifth Amendment claim must be dismissed. *See, e.g.*, *Elkins v. Dist. of

Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) (rejecting plaintiff's attempt to use the Fifth

Amendment to challenge allegedly unlawful search and seizure); *Lyles v. Micenko*, 468 F. Supp.

2d 68, 73 n.5 (D.D.C. 2006) (Leon, J.) (refusing to analyze Fourth Amendment claim under the

rubric of substantive due process).

### 2.    Plaintiffs' Procedural Due Process Claim Is Also Meritless.

To the extent Plaintiffs assert a procedural due process claim, it too must fail.  Plaintiffs

do not appear to make such a claim in their Complaint, other than referencing, in vague and

conclusory fashion, the liberty of "not being deprived of life without due process of law."

Compl. ¶ 54.  But even assuming that Plaintiffs retain some type of liberty interest in this matter

(which they do not), and further assuming that Plaintiffs have in fact made a procedural due

process claim for relief, such a claim should be dismissed because Plaintiffs have failed to

suggest what sort of process is due. *See Elkins*, 690 F.3d at 561 ("To state a procedural due

process claim, a complaint must suggest 'what sort of process is due.'") (quoting *Doe by Fein v.

Dist. of Columbia*, 93 F.3d 861, 869 (D.C. Cir. 1996)).

A liberal reading of Plaintiffs' Complaint unearths a potential claim that the Government

deprived them of the aforementioned (alleged) Fourth Amendment liberty interest without

providing any pre-deprivation notice to Plaintiffs that would allow them to ascertain "the

existence of the surveillance program or the violation of the laws."  Compl. ¶ 6.  To establish a

violation of procedural due process, however, Plaintiffs must show that the Government deprived

them of a "constitutionally protected [liberty or] property interest," and that its "procedures in

doing so do not satisfy procedural due process." *Simms v. Dist. of Columbia*, 872 F. Supp. 2d

90, 95 (D.D.C. 2012); *see also General Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir.

2010).  Even assuming that Plaintiffs retain a residual liberty interest in the privacy of their communications that is entitled to due-process protection above and beyond the protections already afforded by the Fourth Amendment, *see Brown v. McHugh*, 972 F. Supp. 2d 58, 67 (D.D.C. 2013) (Leon, J.) ("[O]nly *after* finding the deprivation of a protected interest do[es] [the Court] look to see if the [government's] procedures comport with due process.") (internal quotation omitted), they are not "due" the pre-deprivation notice they demand.

Where protected liberty interests are implicated, the determination of what process is due requires consideration of three factors:  "(1) the significance of the private party's protected interest, (2) the government's interest, and (3) the risk of erroneous deprivation and 'the probable value, if any, of the additional or substitute procedural safeguards.'"  *General Elec. Co.*, 610 F.3d at 117 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," but rather, it "is flexible and calls for such procedural protections as the particular situation demands," *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal quotation marks and citation omitted), and, as relevant here, takes into account "essential national security considerations."  *Gonzalez v. Freeman*, 334 F.2d 570, 580 n.21 (D.C. Cir. 1964).

Here, the Government's interest in identifying terrorist operatives and intercepting their communications to prevent terrorist attacks is a national security concern that far outweighs any residual privacy interest that Plaintiffs may have in their communications not already protected by the Fourth Amendment, and by the same token outweighs any risk of erroneous deprivation of that interest.  "[N]o governmental interest is more compelling than the security of the Nation."  *Haig*, 453 U.S. at 307.  The NSA's collection of information about and the contents of telephonic and electronic communications thus promotes a governmental interest of the highest order.  *See, e.g.*, *id.*; *In re Sealed Case*, 310 F.3d 717, 746 (F.I.S.C.-R. 2002).

Requiring the Government, however, to provide advance notice to every individual before acquiring information about his or her communications would be incompatible with the secrecy required for such intelligence-gathering programs,[28] and fatal to their objectives. For example, if the Government disclosed to an individual associated with a foreign terrorist organization that his communications (and/or metadata related to them) were to be collected and subject to scrutiny by the Government, that individual, and his associates, could take steps to avoid detection and alter their plans, thus placing national security at greater risk. Due process does not require the Government to put national security at risk in such fashion by providing communications services subscribers the process that Plaintiffs appear to demand. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2727 (2010); *Jifry v. FAA*, 370 F.3d 1174, 1184 (D.C. Cir. 2004). Plaintiffs' procedural due process claim is without merit.

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed.

---

[28] *See, e.g.*, 50 U.S.C. § 1861(d)(1) (recipient may not "disclose to any other person that the [FBI] has sought or obtained" an order under Section 215); *id.* § 1861(f)(2)(A)(i) (providing only recipients the right to challenge lawfulness of Section 215 orders before the FISC); *see also* 50 U.S.C. § 1881a(h)(4), (6) (same with respect to Section 702 directives). Congress also recognized that allowing a similar right to third parties would be incompatible with the secrecy required for Section 215 orders. *See Implementation of the USA PATRIOT Act: Hearing Before the H. Subcomm. on Crime, Terrorism, and Homeland Security, Comm. on the Judiciary*, 109th Cong. at 65 (2005) (statement of Robert Khuzami) ("Beyond this amendment, however, the confidentiality provisions of Section 215 should not be disturbed. You do not want potential terrorists to know you are investigating them or are aware of their plans."). *See also* H.R. Rep. No. 109-174 at 128 (right to challenge Section 215 order can only be given to the recipient, not the target, because the target does not know about it); *id.* at 268 (statutory prohibition on disclosing Section 215 order to subject prevents the subject from challenging it).

45

Dated: June 2, 2014

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JOSEPH H. HUNT
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director

JAMES J. GILLIGAN
Special Litigation Counsel

MARCIA BERMAN
Senior Trial Counsel

BRYAN DEARINGER
Trial Attorney

 _/s/  Rodney Patton_____
RODNEY PATTON
Trial Attorney

JULIA A. BERMAN
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C.  20530
Phone:  (202) 305-7919
Fax:  (202) 305-2685
*Attorneys for the Government Defendants*