**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LARRY KLAYMAN, et. al., | |
| Plaintiffs, | |
| v. | Civil Action Number: 1:14-cv-00092-RJL |
| BARACK HUSSEIN OBAMA II, et. al. | Judge Richard J. Leon |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO THE GOVERNMENT DEFENDANTS' MOTION TO DISMISS AND FRCP 56(d) MOTION FOR DISCOVERY AND/OR IN CAMERA REVIEW

Pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(1), 12(b)(6), 12(d), and 56(d), Larry Klayman, Charles and Mary Ann Strange, Michael Ferrari, and Matt Garrison ("Plaintiffs") request that this Court deny the Government Defendants' Motion to Dismiss on the grounds that Plaintiffs have standing to pursue each of their claims, Plaintiffs have stated claims upon which relief can be granted, and Plaintiffs have not engaged in any so-called "claim-splitting."

In support of Plaintiffs' Opposition to the Government Defendants' Motion to Dismiss, Plaintiffs are filing a Memorandum of Points and Authorities.

Dated: July 23, 2014

/s/ *Larry Klayman*
Larry Klayman, Esq.
Attorney at Law
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN, et. al.,

       Plaintiffs,

v.

BARACK HUSSEIN OBAMA II, et. al.

       Defendants.

Civil Action Number:
1:14-cv-00092-RJL

Judge Richard J. Leon

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO THE GOVERNMENT DEFENDANTS' MOTION TO DISMISS AND
FRCP 56(d) MOTION FOR DISCOVERY AND/OR IN CAMERA REVIEW**

Larry Klayman, Esq.
Attorney at Law
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.      PLAINTIFFS HAVE STANDING TO PURSUE ALL ASSERTED CLAIMS AND,
        THUS, THEIR CLAIMS SHOULD NOT BE DISMISSED FOR LACK OF SUBJECT
        MATTER JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      Plaintiffs Have Standing To Challenge The Bulk Telephone Metadata Program
                Because The NSA Has Collected Their Metadata, And This Court Has Previously
                Found That Plaintiffs Have Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                1.      This Court Has Ruled That Plaintiffs Have Standing To Pursue Their
                        Fourth Amendment Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                2.      Plaintiffs Have Standing To Pursue Their First And Fifth Amendment
                        Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      Plaintiffs Do Not Lack Standing To Challenge The Government Defendants' Bulk
                Collection Of Internet Metadata, And Are Entitled To Monetary And Injunctive
                Relief, Because The Government Defendants Have Accessed And Continue To
                Access Internet Metadata And Other Data Through Section 215 Of The
                FISA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      Plaintiffs Have Standing To Challenge The NSA's Prism Collection Under
                Section 702 Of The FISA As Well As The MUSCULAR
                Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.     PLAINTIFFS' FIRST, FOURTH, AND FIFTH AMENDMENT CHALLENGES
        SHOULD NOT BE DISMISSED BECAUSE PLAINTIFFS HAVE PROPERLY
        STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED. . . . . . . . . . . . . . . 22

III.    PLAINTIFFS DID NOT VIOLATE THE RULE AGAINST "CLAIM-SPLITTING,"
        AND THEY MOVED FOR CLASS CERTIFICATION WITHIN THE ALLOWABLE
        NINETY DAYS UNDER DISTRICT OF COLUMBIA LOCAL CIVIL
        RULE 23.1(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A.    Plaintiffs Did Not Violate The Rule Against Claim-Splitting Because Their Claim In *Klayman III* Is A New Action Involving New Subject Matter, Including New Class Action Allegations, At A New Time, Brought By New Plaintiffs Against New Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.    Under LCvR 23.1(b), It Is Undisputed That Plaintiffs Moved For Certification Under FRCP 23(c)(1) Within Ninety Days After Filing The Complaint. . . . . . . 31

C.    Plaintiffs Have Properly Moved For Class Certification Because No Time Has Lapsed As Plaintiffs' Motions For Extensions Of Time Were Pending. . . . . . . 32

D.    Even If the Ninety-Day Period Is Determined To Have Begun Tolling When Plaintiffs Filed The Complaint In *Klayman I*, Plaintiffs' Request For Extension May Be Granted Under The Doctrine Of Excusable Neglect. . . . . . . . . . . . . . . 33

E.    LCvR 23(b), Which Imposes A Requirement Of Form, Cannot Be Enforced To Cause Plaintiffs To Lose Their Right To Pursue A Class Action Against The Government Defendants Because Any Perceived Failure To Comply To The Rule Was Nonwillful. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IV.   PURSUANT TO FRCP 12(d) AND 56(d), IN THE UNLIKELY EVENT THAT THIS COURT CONSIDERS THE GOVERNMENT DEFENDANTS' FALSE FACTS IN THEIR ATTACHED DECLARATIONS TO THEIR MOTION TO DISMISS, PLAINTIFFS ARE ENTITLED TO DISCOVERY TO RESPOND. . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Chandler v. Miller*,
520 U.S. 305 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Chimel v. California*,
695 U.S. 752 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Clapper v. Amnesty Int'l USA*,
133 S. Ct. 1138 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

\* *Cryer v. InterSolutions, Inc.*,
No. 06-cv-2032, 2007 WL 1191928 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . *passim*

\* *D.A. v. District of Columbia*,
No. 07-1084, 2007 WL 4365452 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Donovan v. Nellis*,
528 F. Supp. 538, 542 (N.D. Fla. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Dorsey v. Holman*,
476 F. App'x 861 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Fed. Deposit Ins. Corp. v. Bender*,
127 F.3d 58 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Halmon v. Jones Lang Wootton USA*,
355 F. Supp. 2d 239 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

\* *Howard v. Gutierrez*,
474 F. Supp. 2d 41 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

\* *In re Vitamins Antitrust Class Action*,
   327 F.3d 1207 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Klayman v. Obama*,
   957 F. Supp. 2d 1 (D.D.C. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ontario v. Quon*,
   560 U.S. 746 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Paul v. Obama*,
   No. 14-cv-262 (D.D.C. Feb. 18 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 31

\* *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
   507 U.S. 380 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

\* *Riley v. California*,
   Nos. 13-132, 13-212, 2014 WL 2864483 (U.S. June 25, 2014) . . . . . . . . . . . . . . . *passim*

*Shallal v. Gates*,
   252 F.R.D. 2 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

\* *Smith v. Maryland*,
   442 U.S. 735 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Jones*,
   132 S. Ct. 945 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Robinson*,
   414 U.S. 218 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Wurie*,
   728 F.3d 1 (1st Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Webster v. Pacesetter, Inc.*,
   270 F. Supp. 2d 9 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39

## U.S. CONSTITUTION

U.S. Const. amend I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. Const. amend IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S. Const. amend V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**RULES**

50 U.S.C. § 1861 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 41

Fed. R. Civ. P. 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Civ. P. 12(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Civ. P. 23(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Civ. P. 56(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 41, 42

L. Cv. R. 7(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 42

L. Cv. R. 23.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**OTHER AUTHORITIES**

5 Moore's Federal Practice § 23.62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Barton Gellman et al., *In NSA-intercepted data, those not targeted far outnumber the foreigners who are: Files provided by Snowden show extent to which ordinary Web users are caught in the net*, Washington Post (July 5, 2014), available at http://www.washingtonpost.com/world/national-security/in-nsa-intercepted-data-those-not-targeted-far-outnumber-the-foreigners-who-are/2014/07/05/8139adf8-045a-11e4-8572-4b1b969b6322_story.html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Brian Fung, *Darrell Issa: James Clapper lied to Congress about NSA and should be fired*, Wa. Post (Jan. 27 2014), available at http://www.washingtonpost.com/blogs/the-switch/wp/2014/01/27/darrell-issa-james-clapper-lied-to-congress-about-nsa-and-should-be-fired/.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Clapper Letter to Sen. Feinstein, available at http://www.dni.gov/files/documents/2013-06-21%20DNI%20Ltr%20to%20Sen.%20Feinstein.pdf. . . . . . . . . . . . . . . . . . . . . . 18

Edward Brunet, *The Timing of Summary Judgment,* 198 F.R.D. 679 (2001) . . . . . . . . . . . . . . 42

Gellman & Soltani, *NSA infiltrates links to Yahoo, Google data centers worldwide,*
    *Snowden documents say*, Washington Post (Oct. 30, 3013), available at
    http://www.washingtonpost.com/world/national-security/nsa-infiltrates-links-to-yahoo-
    google-data-centers-worldwide-snowden-documents-say/2013/10/30/e51d661e-4166-
    11e3-8b74-d89d714ca4dd_story.html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Jose DelReal, *Rand Paul slams James Clapper over NSA 'lying,'* Politico (Dec. 18 2013),
    available at http://www.politico.com/story/2013/12/rand-paul-james-clapper-national-
    security-agency-101306.html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Leighton Woodhouse, *Is The Government Lying About Hoe Much Of Your Metadata It's
    Using?*, Huffington Post (Aug. 15, 2013), available at
    http://www.huffingtonpost.com/2013/08/15/government-metadata_n_3762050.html. . 12

Ron Wyden, Senator for Oregon, *Wyden, Udall on Revelations that Intelligence Agencies
    Have Exploited Foreign Intelligence Surveillance Act 'Loophole,'* Wyden (April 1,
    2014), available at http://www.wyden.senate.gov/news/press-releases/wyden-udall-on-
    revelations-that-intelligence-agencies-have-exploited-foreign-intelligence-surveillance-
    act-loophole. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

RT, *Obama on Clapper's spy lie: 'He should have been more careful'* (Jan. 31 2014),
    available at http://rt.com/usa/obama-dni-clapper-lie-485/.. . . . . . . . . . . . . . . . . . . . . . . 18

## <u>INTRODUCTION</u>

This Court is already intimately familiar with this case and its current procedural posture, and appreciates both the importance of the constitutional questions presented and the national security interests at stake. *See Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013). In the Class Action Complaint ("Complaint") in *Klayman v. Obama*, Civ. No. 14-0092 ("*Klayman III*"), Plaintiffs have filed suit against Barack Hussein Obama, Eric Holder, Keith B. Alexander, Roger Vinson, James Clapper, John O. Brennan, James Comey, the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), the U.S. Department of Justice ("DOJ"), and the National Security Agency ("NSA") (collectively the "Government Defendants"), in their personal and official capacities, for violating Plaintiffs' constitutional rights as a result of their illegal and criminal acts, namely their unconstitutional use of an electronic surveillance program, as set forth in the Complaint. Plaintiffs have requested monetary, declaratory, equitable, and injunctive relief as a result of these unlawful acts.

Plaintiffs respectfully request that this Court deny the Government Defendants' Motion to Dismiss because Plaintiffs do not lack standing to assert any of their claims, Plaintiffs have stated more than enough legally sufficient facts to survive a motion to dismiss, and Plaintiffs have not engaged in any so-called "claim-splitting." Moreover, while the motions for extension were pending until Plaintiffs gave notice that Plaintiffs were no longer going to pursue the class actions in *Klayman v. Obama*, Civ. No. 13-0851 ("*Klayman I*") and *Klayman v. Obama*, Civ. No. 13-0881 ("*Klayman II*"), Plaintiffs informed this Court that Plaintiffs would streamline the case for Plaintiffs and the American people, and that they would file a class action in *Klayman v. Obama*, Civ. No. 14-0092 ("*Klayman III*"), to ultimately get issues before the Supreme Court as soon as possible. Accordingly, no time had lapsed for the motions to extend.

The Government Defendants have also filed attached affidavits to their Motion to Dismiss. Plaintiffs request this court to permit discovery or conduct an in-camera investigation so that Plaintiffs can respond to the false facts that are outlined in the affidavits. Moreover, if the Government Defendants intended to convert the Motion to Dismiss to a summary judgment motion, they should have complied with District of Columbia Local Civil Rule 7(h), which requires that the moving party attach a statement of material facts.

 Due to extreme constitutional importance of this case, Plaintiffs claims cannot be dismissed.

## **BACKGROUND**

On June 5, 2013, *The Guardian*, a British newspaper, reported the first materials leaked by former NSA contract employee Edward Snowden that revealed the existence of U.S. government intelligence collection and surveillance programs. *See* Greenwald, *NSA collecting phone records of millions of Verizon customers daily*, GUARDIAN (London), June 5, 2013; Leon Memorandum Opinion, dated Dec. 16, 2013 ("Mem. Op.") at 6. *The Guardian's* report disclosed a secret Foreign Intelligence Surveillance Court ("FISC") order, dated April 25, 2013, that required Verizon Business Network Services to produce to the NSA on "an ongoing daily basis . . . all call detail records or 'telephony metadata' create by Verizon for communications (i) between the United States and abroad; or (ii) wholly within the United States, including local telephone calls." Secondary Order, *In re Application of the [FBI] for an Order Requiring the Production of Tangible Things from Verizon Business Network Services, Inc. on Behalf of MCI Communication Services, Inc. d/b/a/ Verizon Business Services*, No. BR 13-80 at 2 (FISC Apr. 25, 2013) ("Secondary Order"); Mem. Op. at 6.

The Secondary Order "show[ed] . . . that under the Obama administration the communication records of millions of US citizens are being collected indiscriminately and in bulk—regardless of whether they are suspected of any wrongdoing." Greenwald, *supra*; Mem. Op. at 6-7. The Government Defendants confirmed the authenticity of the Secondary Order as well as the existence of the Bulk Telephony Metadata Program ("Program") under which "the FBI obtains orders from the FISC pursuant to Section 215 [of the USA PATRIOT Act] directing certain telecommunications service providers to produce to the NSA on a **daily basis** electronic copies of 'call detail records.'" Govt.'s Opp'n at 8; Mem. Op. at 7. The Program is "a 'counterterrorism program' under [50 U.S.C. §] 1861[, **conducted for more than seven years**, that] collect[s], compiles, retains, and analyzes certain telephony records, which it characterizes as "business records" created by certain telecommunications companies." Mem. Op. at 15-16. The Program is "meant to detect: (1) domestic U.S. phone numbers calling outside of the United States to foreign phone numbers associated with terrorist groups; (2) foreign phone numbers associated with terrorist groups calling into the U.S. to U.S. phone numbers; and (3) 'possible terrorist –related communications' between numbers inside the U.S." Mem. Op. at 20-21.

The records collected under the Program consist of  "metadata," which includes information about what phone numbers were used to make and receive calls, when the calls took place, and how long the calls lasted. Mem. Op. at 15. Through targeted searches of metadata records, the NSA "tries to discern connections between terrorist organizations and previously unknown terrorist operatives located in the United States." Mem. Op. at 16. The telephone metadata records, which "[telecommunications] companies create and maintain as part of their business of providing telecommunications services to customers[,]" have been continually produced since May 2006 under the FBI's production orders from the FISC. *See* Mem. Op. at 16.

The NSA then consolidates the metadata records provided by different telecommunications companies into one database and under the FISC's orders, the NSA may retain the records for up to five entire years. Mem. Op. at 16. When an NSA intelligence analyst runs a query, the quantity of phone numbers captured is very large, potentially and sometimes up to 1,000,000 numbers total. Mem. Op. at 18-19.

Since, the Program began in May 2006, the FISC has repeatedly issued orders directing telecommunication service providers to produce records in connection with the Program. Mem. Op. at 21. Fifteen different FISC judges have issued thirty-five orders authorizing the Program and under those orders, the Government defendants must continuously seek renewal of the authority to collect telephony records, which occurs as often as every ninety days. Mem. Op. at 21. The Government Defendants admit that they have failed to comply with the minimization procedures set forth in the orders. Mem. Op. at 21. Judge Reggie Walton of the FISC concluded he had no confidence that the Government was doing its utmost to comply with the court's orders. Mem. Op. at 21-22. Judge John Bates, Presiding Judge of the FISC, found that the Government had misrepresented the scope of its targeting of certain internet communications pursuant to 50 U.S.C. § 1881a. Mem. Op. at 22. The Government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which he Government disclosed a substantial misrepresentation regarding the scope of a major collection program. Mem. Op. at 23.

After the public revelations of the Government Defendants' secret schemes in the media, Plaintiffs filed a complaint on June 6, 2013 (*Klayman I*). *See* Mem. Op. at 8. *Klayman I* Plaintiffs Larry Klayman, Charles Strange, and Mary Ann Strange, all subscribers of Verizon Wireless, brought suit against the NSA, the DOJ, multiple executive officials, whom include President

Barack H. Obama, Attorney General Eric H. Holder, Jr., General Keith B. Alexander, Director of the NSA, and U.S. District Judge Roger Vinson, and Verizon Communications as well as its chief executive officer. Second Am. Compl. ¶¶ 9-19; Mem. Op. at 8. On June 9, 2013, Plaintiffs filed an amended complaint in *Klayman I* to include class action allegations for the first time. *See* Amended *Klayman I*, June 9, 2014. As relief, Plaintiffs sought a preliminary injunction "that, during the pendency of this suit, (i) bars [d]efendants from collecting [p]laintiffs' call records under the mass call surveillance program; (ii) requires [d]efendants to destroy all of [p]laintiffs' call records already collected under the program; and (iii) prohibits [d]efendants from querying metadata obtained through the program using any phone number or other identifier associated with [p]laintiffs . . . and such other relief as may be found just and proper." Mem. Op. at 2-3.

Plaintiffs filed their second complaint, *Klayman II*, on June 12, 2013. *Klayman II*. Plaintiffs then filed two Motions for Extension of Time to Certify Class Action ("Motions for Extension" or "Motions for Extension of Time") on September 30, 2013. *See* Mot. for Ext. of Time to Certify Class Action, *Klayman I & Klayman II*.

On December 16, 2013, this Court issued its Memorandum Order in *Klayman I*. Mem. Op. The Court found that it had authority to evaluate Plaintiffs' constitutional challenges to the NSA's conduct. Mem. Op. at 5. After careful analysis of the facts, this Court ruled that the NSA's bulk telephony metadata collection and analysis violates a reasonable expectation of privacy, Mem. Op. at 47, and thus, the NSA's bulk collection program is an unreasonable search under the Fourth Amendment. Mem. Op. at 62. To determine whether the Court should grant Plaintiffs' request for a preliminary injunction, the Court concluded that "Plaintiffs have standing to challenge the constitutionality of the Government's bulk collection and querying of phone

record metadata,[1] that they have demonstrated a substantial likelihood of success on the merits of their Fourth Amendment claim, and that they will suffer irreparable harm absent preliminary injunctive relief." Mem. Op. at 5. The Court also concluded that the public interest weighs heavily in favor of granting an injunction. Mem. Op. at 65. Accordingly, the Court granted the Motion for Preliminary Injunction in *Klayman I*. Mem. Op. at 5. The Court determined that it would stay its order pending appeal. Mem. Op. at 6.

In a Praecipe dated January 15, 2014, while the motions for extension were pending, Plaintiffs told the Court that "in order to streamline and to expedite [*Klayman I* and *Klayman II*] . . . , they [would] not be moving for class action but rather there [would] be filed a separate class action suit filed as a related case." Praecipe, dated Jan. 15, 2014, *Klayman I* and *Klayman II*. The purpose of the Praecipe was to provide notice of a new class action, that would ultimately benefit Plaintiffs and the American people, and to put this case potentially before the Supreme Court in an expedited manner. Plaintiffs, at this time, were awaiting a decision on their motions for extension of time. As such, no time has lapsed, as these extensions are technically still pending. Moreover, Senator Rand Paul's class action[2] is currently pending before this Court. Plaintiffs take the position that since Rand Paul's class action is related to Plaintiffs' case, and because this Court has to consider Rand Paul's class action anyway, this Court should consider consolidating the cases to save judicial and private resources, in addition to the fact that having more attorneys on such a large a case[3] is beneficial.

---

[1] Plaintiffs have standing to challenge both of the NSA's Bulk Telephony Metadata Program's searches: (1) the bulk collection of metadata and (2) the analysis of that data through the NSA's querying process. Mem. Op. at 36.

[2] *Paul v. Obama*, No. 14-cv-262 (D.D.C. Feb. 18 2014).

[3] There will be millions of overlapping Plaintiffs if Rand Paul's class action is not consolidated with Plaintiffs' case.

On January 23, 2014, Plaintiffs filed a Class Action Complaint in *Klayman III* outlining new facts and allegations. *Klayman III*. Among these facts and allegations include the Government Defendants' unlawful use of a Government program entitled MUSCULAR, in which the FBI, CIA, and NSA have been intercepting information from companies such as Google and Yahoo! as it travels over fiver optic cables from one data center to another. *Id.* at 6.

On February 3, 2014, in a hearing before this Court, Plaintiffs orally reiterated their consideration for streamlining the cases and moving as quickly as possible because, as Plaintiffs stated, "when constitutional rights are violated for one minute, that's one minute too long . . . ." Transcript, Hearing, 11:12-16 (Feb. 3, 2014). As expressed, streamlining the cases are essentially beneficial to both Plaintiffs and the American people, and they cannot wait any longer.

In response to the *Klayman III* complaint, the Government Defendants filed their Motion to Dismiss on June 2, 2014. Gov. Motion to Dismiss *Klayman III*.
The Government Defendants argue, without providing any evidence whatsoever, that the Bulk Internet Metadata Program had been discontinued in 2011, and thus, Plaintiffs cannot seek prospective injunctive relief. Gov. *Id.* at 21. Plaintiffs have requested monetary damages in addition to injunctive relief, insomuch as to prevent the allegedly "discontinued" program from being re-continued. *Klayman III* at ¶73-74. Accordingly, Plaintiffs' claim concerning the Bulk Internet Metadata Program is not moot.

Before Plaintiffs filed this Opposition to the Government Defendants' Motion to Dismiss, the Supreme Court of the United States of America ("Supreme Court") issued its recent decision in *Riley v. California*, Nos. 13-132, 13-212, 2014 WL 2864483, *1 (U.S. June 25, 2014), holding that "[t]he police generally may not, without a warrant, search digital information on a cell phone

seized from an individual who has been arrested." Chief Justice John Roberts made it clear in the majority opinion that the Supreme Court's decision would "have an impact on the ability of law enforcement to combat crime," that cell phones are essentially "minicomputers" that "also happen to have the capacity to be used as a telephone," and that "[p]rivacy comes at a cost." *Riley*, 2014 WL 2864483, at *14, 19. The Supreme Court found that "modern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* at *9. The Supreme Court also held that "a search of digital information on a cell phone does not further [ ] government interests . . . and implicates substantially greater individual privacy interests than a brief physical search." *Id.* at *1. Due to the highly sensitive data located in our cell phones, the Supreme Court further made it clear that "**a warrant is generally required before [ ] a search, even when a cell phone is seized incident to arrest.**"[4] *Id.* at *19 (emphasis added). Because "[d]igital data stored on a cell phone cannot itself be used as a weapon" and "can endanger no one," the Government Defendants do not have a compelling reason to search citizens' telephony and internet metadata at their discretion. *See id.* at *2.

The fact that internet metadata, in addition to telephony metadata, both of which are accessible on a cell phone, is at issue here, makes the present case even more compelling. Indeed, the Supreme Court's decision will have a substantial impact on the outcome of this case, as it further shatters the Government Defendants' argument that *Smith v. Maryland*, 442 U.S. 735 (1979) is indistinguishable from the present case, which this Court has already determined that

---

[4] "Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—*get a warrant*." *Riley*, 2014 WL 2864483, at *20 (emphasis added).

the Government Defendants' argument was misguided. *See* Mem. Op. at 44; Gov. Motion to

Dismiss *Klayman III* at 28.

## ARGUMENT

I.   PLAINTIFFS HAVE STANDING TO PURSUE ALL ASSERTED CLAIMS AND,
THUS, THEIR CLAIMS SHOULD NOT BE DISMISSED FOR LACK OF SUBJECT
MATTER JURISDICTION.

Plaintiffs' claims should not be dismissed for lack of subject matter jurisdiction because

Plaintiffs have standing to pursue each of their claims. Under FRCP 12(b)(1), a party may move

to dismiss a claim for lack of subject-matter jurisdiction due to lack of standing. *Edwards v.*

*Aurora Loan Services, LLC*, 791 F. Supp. 2d 144, 147, 149 (D.D.C. 2011); Fed. R. Civ. P.

12(b)(1).

To establish Article III standing, an injury must be "concrete, particularized, and actual or

imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson*

*Seed Farms*, 561 U.S. 139, 149 (2010)). "Although imminence is concededly a somewhat elastic

concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is

not too speculative for Article III purposes—that the injury is *certainly* impending.'" *Clapper*,

133 S. Ct. at 1147 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992)). Under

the circumstances of this case, this Court has already ruled that Plaintiffs have standing to

challenge the NSA's Bulk Telephony Metadata collection and analysis. *See* Leon Memorandum

Opinion, dated Dec. 16, 2013 ("Mem. Op.") at 36.

A.      Plaintiffs Have Standing To Challenge The Bulk Telephone Metadata Program Because The NSA Has Collected Their Metadata, And This Court Has Previously Found That Plaintiffs Have Standing.

1.      This Court Has Ruled That Plaintiffs Have Standing To Pursue Their Fourth Amendment Claim.

Plaintiffs have standing to challenge the NSA's Bulk Telephony Metadata Program, which involves the bulk collection of metadata and the analysis of that data through the NSA's querying process. This Court has ruled that "[P]laintiffs have standing to challenge both" of the NSA's Bulk Telephony Metadata Program's two potential searches: (1) the bulk collection of metadata and (2) the analysis of that data through the NSA's querying process." Mem. Op. at 36. The Court also ruled that the facts that arise in Plaintiffs claims are distinguishable from *Clapper*, where the plaintiffs "could only speculate as to whether they would be surveilled at all, [P]laintiffs in this case can point to strong evidence that, as Verizon customers, their telephony metadata has been collected for the last seven years (and stored for the last five) and will continue to be collected barring judicial or legislative intervention." Mem. Op. at 36-37. The Court concludes, "[P]laintiffs meet the standing requirements set forth in *Clapper*, as they can demonstrate that the NSA has collected and analyzed their telephony metadata and will continue to operate the program consistent with FISC opinions and orders." Mem. Op. at 42. As such, Plaintiffs do not speculate that their metadata has been collected because Plaintiffs are *certain* their data has been collected for the last seven years. *See* Mem. Op. at 36-38 ("[T]he NSA *must* have collected metadata from Verizon Wireless . . . ."). As this Court stated, the Government has declassified and authenticated a FISC Order signed by Judge Vinson confirming that the NSA has indeed collected telephony metadata from Verizon.[5] In fact, the Court found that the Government Defendants themselves described the advantages of bulk collection in such a way to

---

[5] Plaintiffs are Verizon customers. *See* Mem. Op. at 3 n.5, 36.

convince the Court that "Plaintiff's metadata—indeed *everyone's* metadata—is analyzed, manually or automatically . . . ." Mem. Op. at 39. The Court also found that Plaintiffs have standing to challenge the NSA's querying procedures. Mem. Op. at 38.

The Government Defendants assert that "Plaintiffs have failed to demonstrate that that they have suffered a cognizable Fourth Amendment injury because they have not pled sufficient facts from which it can be concluded that records of their calls have been acquired or reviewed under the bulk telephony metadata program." Gov. Motion to Dismiss *Klayman III* at 12. They also assert that "it cannot be assumed solely on the basis that Plaintiffs are subscribers to certain telecommunications companies that metadata about their calls have been produced to the NSA as part of the Section 215 program." *Id*. at 13. The Government Defendants further argue that "Plaintiffs' allegations of 'injury,' that the NSA has reviewed the records associated with the calls, are speculative and conjectural, not actual or imminent, as Article III requires." *Id.* They insist that "Plaintiffs make no well-pleaded, non-conclusory allegations that the NSA has accessed or reviewed records of their calls . . . ," and thus, "Plaintiffs' claims that this program violates the Fourth Amendment must be dismissed. *Id.* at 15-16, 19. Like Plaintiffs' Fourth Amendment claim, the Government Defendants argue that Plaintiffs lack standing regarding their First and Fifth Amendment claims because Plaintiffs' allegations are "speculative." *See id.* at 19.

The Government Defendants lack merit, and are merely strategic in their deceptive ways. Under the Government Defendants' legal theories, no Plaintiff could successfully allege injury absent actual evidence that their particular metadata had been searched, which is nearly impossible because the Government Defendants refuse to hand over any information or relevant documents, and even refuse to engage in a FRCP 26 conferences, much more participate in

responding to any subsequent discovery requests. Indeed, the Government Defendants act as if they are above the law, much less the rules of this Court. The individual Defendants refuse to even respond to the Complaints in *Klayman I* and *Klayman II*, despite being served in *Klayman* I and *Klayman* II, and in this case. If this Court were to accept the Government Defendants' arguments alleging Plaintiffs' supposed lack of standing, which this Court has previously denied,[6] then any person who "seek[s] to challenge the surveillance programs will be caught in a nearly impossible conundrum . . . ." *See* Leighton Woodhouse, *Is The Government Lying About Hoe Much Of Your Metadata It's Using?*, Huffington Post (Aug. 15, 2013), available at http://www.huffingtonpost.com/2013/08/15/government-metadata_n_3762050.html. Plaintiffs would "need to show that their metadata was swept up in an NSA query, a task that requires access to state secrets. Unless the government were to take the unlikely step of granting the opposing counsel the necessary security clearances to acquire this evidence, the standard for achieving standing would be virtually impossible to meet."[7] *Id.* The Government Defendants ultimately hold all the cards and, thus, they must reveal the truth to the American people. But for Edward Snowden, they would still be in the dark.

---

[6] *See* Mem. Op. at 36.

[7] "Even this scenario, however, puts control of the process largely in the [G]overnment's hands, as federal prosecutors [or the Government Defendants] are able to decide whether to press charges and whether to use the NSA-derived evidence, weighing the benefits of doing so against the risk of inviting a challenge to the surveillance programs." Woodhouse, Huffington Post, *supra.* "If federal prosecutors [or the Government Defendants] can avoid using NSA-derived evidence . . . , and if their argument on standing is upheld by the courts, then the government can indefinitely forestall any possibility of a plaintiff meeting the "actual and imminent harm" standard. And if the standard for achieving standing is unattainable, then the surveillance programs are effectively immunized from Constitutional challenge." *Id.*

2.      Plaintiffs Have Standing To Pursue Their First And Fifth Amendment
        Claims.

After this Court ruled that Plaintiffs have standing to pursue their Fourth Amendment

claim, the Court never ruled that Plaintiffs do not lack standing to pursue their First and Fifth

Amendment Claims. *See* Mem. Op. at 5 n.7. Plaintiffs do not speculate collection and misuse of

their metadata—Plaintiffs are certain of it, as was this Court as found in the preliminary

injunction order in *Klayman I. See* Mem. Op.

Regarding Plaintiffs' first amendment[8] claim, such certainty has led to the chilling of

their speech and a violation of their right of freedom of association by making others wary and

fearful of contacting other persons via cell phone out of the fear of the known misuse of

Government power and retaliation against Plaintiffs as well as those persons and entities who

challenge the misuse of Government power. *See Klayman III* at ¶¶ 60-61. Plaintiffs do not

simply fear the possible surveillance of the Government, Plaintiffs are aware of actual and

proven surveillance—much more than enough to confer standing. *See* Mem. Op. at 38 ("[T]he

NSA . . . collected metadata."). This Court has already found that the Government Defendants

queried and reviewed Plaintiffs' metadata.  Mem. Op. at 38-39 ("I find that Plaintiffs [ ] have

standing to challenge the NSA's querying procedures . . . .Plaintiff's metadata—indeed

*everyone's* metadata—is analyzed, manually or automatically . . . .").

As stated in the *Klayman III* Complaint, "Plaintiffs and the members of the Class enjoy a

liberty interest in their personal security and in being free from the [Government] Defendants'

use of unnecessary and excessive force or intrusion against his person." *Klayman III* at ¶ 53.

---

[8] The First Amendment to the U.S. Constitution states that "Congress shall make no law
respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the
freedom of speech, or of the press; or the right of the people peaceably to assemble, and to
petition the government for a redress of grievances." U.S. Const. amend I.

Plaintiffs also "enjoy a liberty of not being deprived of life without due process of law." *Id.* at ¶ 54. The Government Defendants violated Plaintiffs' "constitutional rights when they authorized broad and intrusive collections of records of individuals through the PRISM and MUSCULAR surveillance programs, thereby giving the Government and themselves unlimited authority to obtain **both** telephony and internet data[9] for a specified amount of time." *Id.* at ¶ 55.

The Government Defendants do not address the issue of standing regarding Plaintiffs' Fifth Amendment[10] claim. Instead, in a simple footnote, the Government Defendants argue that "[f]or purposes of standing, Plaintiffs' Fifth Amendment claim is predicated on the same factual allegations as their First and Fourth Amendment claims." Gov. Motion to Dismiss *Klayman III* at 19 n.9. The Government Defendants have failed to sufficiently establish why Plaintiffs' Fifth Amendment claim does not meet the requirements of standing. In essence, the Government Defendants' argue that the fact a certain claim is "predicated on the same factual allegations" as another claim, determines whether that claim lacks standing. Using this logic, Plaintiffs do have standing to pursue their Fifth Amendment claim, which is undisputedly predicated on the same factual allegations as their Fourth Amendment claim, because this Court has already determined that Plaintiffs have standing to pursue their Fourth Amendment claim.

---

[9] The Supreme Court has recently found that smart phones are "cell phone[s] with a broad range of other functions based on advanced computing capability, large storage capacity, **and Internet connectivity**." *Riley v. California*, Nos. 13-132, 13-212, 2014 WL 2864483, *4 (U.S. June 25, 2014) (emphasis added).

[10] The Fifth Amendment to the U.S. Constitution states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend V.

  B.  Plaintiffs Do Not Lack Standing To Challenge The Government Defendants' Bulk Collection Of Internet Metadata, And Are Entitled To Monetary And Injunctive Relief, Because The Government Defendants Have Accessed And Continue To Access Internet Metadata And Other Data Through Section 215 Of The FISA.

  The Government Defendants have collected Plaintiffs' Internet metadata, and thus, Plaintiffs have standing to challenge the Government Defendants' bulk collection of internet metadata under Section 215. The Government Defendants contend that the Program, authorized under Section 215 of the FISA, used to access Internet metadata and other data "was discontinued in 2011," and thus, "Plaintiffs lack standing to pursue any prospective injunctive relief." *See* Gov. Motion to Dismiss Klayman III at 20-21; *see also* Govt. Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Govt.'s Opp'n") [Dkt. # 25], at 15–16, 44–45; Ex. J to Decl. of James J. Gilligan ("Gilligan Deck") [Dkt. # 25–11] (Letter from James R. Clapper to the Sen. Ron Wyden (July 25, 2013)). Although this Court has found it had no need to address Plaintiffs' claims requesting preliminary injunctive relief regarding any alleged internet data surveillance activity because "the Government represented that any bulk collection of internet *metadata* pursuant to Section 215 (50 U.S.C. § 1861) was discontinued in 2011, the Government Defendants have, on a number of occasions, misrepresented their conduct before Congress and other courts, and therefore cannot be believed. The Government Defendants have offered no real much more verifiable proof that they discontinued the Program. Regardless of the Government Defendants' unfounded assertion that they discontinued the Program, Plaintiffs are entitled to both monetary and injunctive relief for past illegal and unconstitutional conduct. *Klayman III* at ¶73-74.

  The Government Defendants cannot be believed, as evidenced by their repetitive deceptive conduct, and thus, this Court should not accept their assertion that they ceased accessing Internet metadata and other data through Section 215 absent discovery. The

Government Defendants have been caught, on a number of occasions committing perjury—that is, lying to the judiciary, Congress, and the American people. Consistent with this, the Government Defendants will stop at nothing to deceive this Court today. The Government Defendants are simply dishonest: they make false representations that they have ceased accessing Internet metadata and other data through Section 215, without providing any credible or verifiable evidence, and then they seek to dismiss Plaintiffs' claims for lack of standing so that they can avoid discovery, which would ultimately confirm further the Government Defendants' illegal secret schemes to the public. Under this subterfuge, the Government Defendants intend for no party to successfully challenge the Government's violations of the U.S. Constitution. Unfortunately for the Government Defendants, this Court is well aware of their deceptive ways.

As Plaintiffs have previously pointed out, the Government Defendants acknowledge, as they must, that they have failed to comply with the minimization procedures set forth in certain orders.[11] Mem. Op. at 21. In 2009, the Government Defendants reported to the FISC that the NSA had improperly used an "alert list" of identifiers to search the bulk telephony metadata, which was composed of identifiers that had *not* been approved under the RAS standard. Mem. Op. at 21. Judge Reggie Walton of the FISC, who reviewed the Government Defendants' reports on their noncompliance, concluded that the NSA had engaged in "systematic noncompliance" with FISC-ordered minimization procedures over the proceeding years, since the inception of the Bulk Telephony Metadata Program, and had also **repeatedly made misrepresentations and inaccurate statements about the program** to the FISC judges. Mem. Op at 21. **Judge Reggie**

---

[11] "Since, the Program began in May 2006, the FISC has repeatedly issued orders directing telecommunication service providers to produce records in connection with the Program. Mem. Op. at 21. Fifteen different FISC judges have issued thirty-five orders authorizing the Program and under those orders, the Government defendants must continuously seek renewal of the authority to collect telephony records, which occurs as often as every ninety days. Mem. Op. at 21." Plaintiffs' Motion for Partial Summary Judgment ("Mot. Partial SJ") at 3.

**Walton concluded that he had no confidence that the Government was doing its utmost to comply with the court's orders**, and ordered the NSA to seek FISC approval on a *case-by-case basis* before conducting any further queries of the bulk telephony metadata collected pursuant to Section 1861 orders. Mem. Op at 21.

The Government Defendants have also had further compliance problems relating to its collection programs in subsequent years. Mem. Op. at 21. In 2011, the Presiding Judge of the FISC, **Judge John Bates, found that the Government had misrepresented the scope of its targeting of certain internet communications** pursuant to 50 U.S.C § 1881a. Mem. Op. at 21. Judge Bates wrote "the Court is troubled that **the government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the government has disclosed a substantial misrepresentation regarding the scope of a major collection program**." Mem. Op. at 21-22. In fact, since January 2009, the FISC's authorizations of the collection program has "been premised on a flawed depiction of how the NSA uses BR metadata." Mem. Op. at 22 n.23. "This misperception by the FISC existed from the inception of its authorized collection in May 2006, buttressed by repeated inaccurate statements made in the government's submissions, and despite a government-devised and Court-mandated oversight regime." Mem. Op. at 22 n.23. The minimization procedures proposed by the government in each successive application and approved and adopted as binding by the orders of the FISC have been so frequently and systemically violated that it can fairly be said that this critical element of the overall BR regime has never functioned effectively." Mem. Op. at 22 n.23

The Government Defendants' plethora of misrepresentations does not stop here. Senator Ron Wyden asked James Clapper ("Clapper"), Director of National Intelligence, whether the

NSA collected "any type of data at all on millions or hundreds of millions of Americans." Brian

Fung, *Darrell Issa: James Clapper lied to Congress about NSA and should be fired*, Wa. Post

(Jan. 27 2014), available at http://www.washingtonpost.com/blogs/the-

switch/wp/2014/01/27/darrell-issa-james-clapper-lied-to-congress-about-nsa-and-should-be-

fired/. Clapper infamously replied, "No, sir … not wittingly." *Id.* Edward Snowden's revelations

and leaked NSA documents forced Clapper to admit that he knowingly lied to Congress under

oath. RT, *Obama on Clapper's spy lie: 'He should have been more careful'* (Jan. 31 2014),

available at http://rt.com/usa/obama-dni-clapper-lie-485/. He later apologized to committee

chairperson Senator Dianne Feinstein, admitting that his response "was clearly erroneous—for

which [he] apologize[d]." Clapper Letter to Sen. Feinstein, available at

http://www.dni.gov/files/documents/2013-06-

21%20DNI%20Ltr%20to%20Sen.%20Feinstein.pdf.

　　　Senator Rand Paul told CNN "[t]hat Clapper is lying to Congress is probably more

injurious to our intelligent capabilities than anything Snowden did." Jose DelReal, *Rand Paul

slams James Clapper over NSA 'lying*,*'* Politico (Dec. 18 2013), available at

http://www.politico.com/story/2013/12/rand-paul-james-clapper-national-security-agency-

101306.html. Senator Paul added that, just as the Government Defendants' have continually

demonstrated, "Clapper has damaged the credibility of the entire intelligence apparatus and [he

is] not sure what to believe anymore when they come to Congress."[12] *Id.* "It is now clear to the

public that the list of ongoing intrusive surveillance practices by the NSA includes not only bulk

collection of Americans' phone records, but also warrantless searches of the content of

---

[12] Relevant to the points made herein, Senator Rand Paul also stated to CNN that "[i]f the
intelligence community says we're not spying on Americans and they are, and then they say
we're not collecting any data, it's hard to have confidence in them." Politico, *supra.*

Americans' personal communications." Ron Wyden, Senator for Oregon, *Wyden, Udall on Revelations that Intelligence Agencies Have Exploited Foreign Intelligence Surveillance Act 'Loophole*,*'* Wyden (April 1, 2014), available at http://www.wyden.senate.gov/news/press-releases/wyden-udall-on-revelations-that-intelligence-agencies-have-exploited-foreign-intelligence-surveillance-act-loophole.

Most recently, The Washington Post conducted a four-month investigation and analysis based on documentation supplied by Edward Snowden, and found that "[ordinary Internet users, American and non-American alike, far outnumber legally targeted foreigners in the communications intercepted by the National Security Agency from U.S. digital networks." Barton Gellman et al., *In NSA-intercepted data, those not targeted far outnumber the foreigners who are: Files provided by Snowden show extent to which ordinary Web users are caught in the net*, Washington Post (July 5, 2014), available at http://www.washingtonpost.com/world/national-security/in-nsa-intercepted-data-those-not-targeted-far-outnumber-the-foreigners-who-are/2014/07/05/8139adf8-045a-11e4-8572-4b1b969b6322_story.html (Exhibit 1) In fact, "[n]ine of 10 account holders found in a large cache of intercepted conversations, which former NSA contractor Edward Snowden provided in full to *The Washington Post*, were not the intended surveillance targets but were caught in a net the agency had cast for somebody else . . . . Many of them were Americans. Nearly half of the surveillance files, a strikingly high proportion, contained names, e-mail addresses or other details that the NSA marked as belonging to U.S. citizens or residents." *Id.* Unsurprisingly, "[n]one of the hits that were received were relevant . . . ."[13] *Id.* The Washington Post correctly pointed out:

---

[13] "Many other files, described as useless by the analysts but nonetheless retained, have a startlingly intimate, even voyeuristic quality. They tell stories of love and heartbreak, illicit sexual liaisons, mental-health crises, political and religious conversions, financial anxieties and

"By law, the NSA may target' only foreign nationals located overseas unless it obtains a warrant based on probable cause from a special surveillance court. For collection under PRISM and Upstream rules, analysts must state a reasonable belief that the target has information of value about a foreign government, a terrorist organization or the spread of nonconventional weapons. Most of the people caught up in those programs are not the targets and would not lawfully qualify as such." *Id.*

Despite what the Government Defendants continue to assert, The Washington Post found that "[t]he NSA treats all content intercepted incidentally from third parties as permissible to retain, store, search and distribute to its government customers." *Id.* "If Snowden's sample is representative, the population under scrutiny in the PRISM and Upstream programs is far larger than the government has suggested." *Id.* Ultimately, "[w]hen NSA and allied analysts really want to target an account, their concern for U.S. privacy diminishes." *Id.* "[T]he NSA does not discard what it no longer needs." *Id.* The Washington Post's latest revelations and findings lend further support to the fact that the Government Defendants cannot be believed. *See* Gov. Motion to Dismiss *Klayman III*, Attached Declaration of Shea ("Declaration"); FRCP 56(d) Motion (Exhibit 2); FRCP(d) Affidavit (Exhibit 3).

Even if the Government Defendants discontinued their Bulk Internet Metadata Program, which they most likely did not, the Government Defendants could, and most likely will, resume accessing Internet metadata and other data through section 215 or some other vehicle, as part of the deceptive shell game they have been playing to deceive Congress and the American people. *See* Plaintiffs' Opposition to Motion to Stay, dated Jan. 15, 2014, Docket No. 53. If this Court orders the Government Defendants to cease accessing citizens' metadata data through Section 215, the Government Defendants know, as do we, that they can simply violate the order as they have effortlessly done in the past. The Government Defendants have proven time and time again

---

disappointed hopes. The daily lives of more than 10,000 account holders who were not targeted are catalogued and recorded nevertheless." Gellman, *NSA-intercepted data,* Washington Post, *supra*.

by their own conduct that they will violate court-mandated orders and, when "necessary" to serve their own ends, lie and perjure themselves under oath to hide the truth. Therefore, the Government Defendants' seemingly false assertion that they ceased accessing internet metadata and other data through Section 215 does not render Plaintiffs' claims moot.

The fact that Plaintiffs have requested monetary damages in addition to injunctive relief also renders Plaintiffs' claims regarding the collection of metadata through Section 215 not moot. As such, Plaintiffs are entitled to monetary damages for the harm caused during the period that the Government Defendants admit that they were collecting citizen's Internet metadata and other data through Section 215. Discovery is at a minimum necessary to determine the extent and amount of monetary damages that Plaintiffs are entitled in regards to the time period that the Government Defendants have alleged they are no longer accessing such metadata.

C.      Plaintiffs Have Standing To Challenge The NSA's Prism Collection Under Section 702 Of The FISA As Well As The MUSCULAR Program.

PRISM is a classified surveillance program and an internal Government computer system authorized by Section 702 of the FISA that collects records of all communications companies, including but not limited to Google, Yahoo!, Facebook, PalTalk, YouTube, Skype, AOL, Verizon, AT&T, and Sprint.[14] *Klayman III* at ¶2. On information and belief, the Government Defendants have accessed Plaintiffs' records through PRISM. *See id.* at ¶10-11.

Plaintiffs' communications have also been acquired under the MUSCULAR Program, which Plaintiffs have standing to challenge. The Government Defendants violated Plaintiffs' and Class members' constitutional rights when they authorized broad and intrusive collections of

---

[14] "One program, code-named PRISM, extracts content stored in user accounts at Yahoo, Microsoft, Facebook, Google and five other leading Internet companies." Gellman, *NSA-intercepted data,* Washington Post, *supra.*

records of individuals through the PRISM and MUSCULAR[15] surveillance programs. *Klayman III* at 17. The Government Defendants admit that they have not denied the existence of the intelligence program MUSCULAR. Gov. Motion to Dismiss *Klayman III* at 23. Plaintiffs do in fact have actual knowledge of this program. Plaintiffs have standing to challenge the MUSCULAR Program, just like this Court has already found regarding Plaintiffs' Fourth Amendment Claim. *See* Mem. Op. at 35.

II.     PLAINTIFFS' FIRST, FOURTH, AND FIFTH AMENDMENT CHALLENGES SHOULD NOT BE DISMISSED BECAUSE PLAINTIFFS HAVE PROPERLY STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

When ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a court must assume the veracity of all "well-pleaded factual allegations" in the complaint, but need not accept as true "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); Fed. R. Civ. P 12(b)(6).

---

[15] "The NSA's principal tool to exploit the data links is a project called MUSCULAR, operated jointly with the agency's British counterpart, the Government Communications Headquarters." Gellman & Soltani, *NSA infiltrates links to Yahoo, Google data centers worldwide, Snowden documents say*, Washington Post (Oct. 30, 3013), available at http://www.washingtonpost.com/world/national-security/nsa-infiltrates-links-to-yahoo-google-data-centers-worldwide-snowden-documents-say/2013/10/30/e51d661e-4166-11e3-8b74-d89d714ca4dd_story.html. "For the MUSCULAR project, the GCHQ directs all intake into a "buffer" that can hold three to five days of traffic before recycling storage space. From the buffer, custom-built NSA tools unpack and decode the special data formats that the two companies use inside their clouds. Then the data are sent through a series of filters to "select" information the NSA wants and "defeat" what it does not." *Id.* "Because digital communications and cloud storage do not usually adhere to national boundaries, MUSCULAR and a previously disclosed NSA operation to collect Internet address books have amassed content and metadata on a previously unknown scale from U.S. citizens and residents. Those operations have gone undebated in public or in Congress because their existence was classified." *Id.* "One weekly report on MUSCULAR says the British operators of the site allow the NSA to contribute 100,000 "selectors," or search terms. That is more than twice the number in use in the PRISM program." *Id.*

Here, Plaintiffsl claims are each legally and factually much more than sufficient to withstand a motion to dismiss. Included in these claims are Plaintiffs' First Amendment claim, Fifth Amendment claim, and Fourth Amend claim—all of which set forth facts that fulfill each of the required elements of their respective claims. Each of Plaintiffs' factual allegations offer much more than "the adorned, the –defendant-unlawfully-harmed-me accusation." *See id.*; *Klayman III*. Each of the counts set forth in the Complaint contain facts that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," as this Court has already found. *See Ashcroft*, 556 U.S. at 678; Mem. Op. At this stage, the "[C]ourt must accept as true all of the allegations contained in [the]complaint . . . ." *Ashcroft*, 556 U.S. at 678.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. That right "shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or thing to be seized." *Id.*

Under the Fourth Amendment, this Court ruled that "the collection and analysis of Telephony Metadata constitutes a search." The Court also found that "it [was] significantly likely" that the Court would answer the question of whether people have a reasonable expectation of privacy that is violated when the Government Defendants, without any basis whatsoever to suspect them of any wrongdoing, collect and stores for five years their telephony metadata for purposes of subjecting it to high-tech querying and analysis without any case-by-case judicial approval, "in [P]laintiff's favor." Mem. Op. at 56.

This Court has already ruled in *Klayman I* that "Plaintiffs have shown a substantial likelihood of success on the merits." Mem. Op. at 35. The Court found that "because the Government [Defendants] can use daily metadata collection to engage in 'repetitive , surreptitious surveillance of a citizen's private goings on,' the NSA database 'implicates the Fourth Amendment each time a government official monitors it.'" Mem. Op. at 40-41.  In addition to this Court previously ruling that *Smith v. Maryland*, 442 U.S. 735 (1979) does not apply to the circumstances involving Plaintiffs' Fourth Amendment claim against the Government Defendants, the Supreme Court's recent decision in *Riley v. California*, Nos. 13-132, 13-212, 2014 WL 2864483 (U.S. June 25, 2014) defeats any remaining arguments that *Smith* forecloses Plaintiffs' Fourth Amendment claim. In fact, the Supreme Court's ruling in *Riley* demolishes any further arguments in favor of applying *Smith* to the present case.

The Government Defendants are once again deceptively misguided in their flawed arguments that *Smith* controls Plaintiffs' claims. This Court previously disagreed with the "Government [Defendants'] argument . . . that under *Smith*, no one has an expectation of privacy, let alone a reasonable one, in the telephony metadata that telecom companies hold as business records; [and] therefore the Bulk Telephony Metadata Program is not a search." Mem. Op. at 44. Most importantly, the Court found that the question before the Court was "*not* the same question that the Supreme Court confronted in *Smith*," and that the issues in *Smith* were a "far cry from the issue[s] in [these] case[s]."[16] Mem. Op. at 44. The Court determined that present-day

---

[16] "[T]he relationship between the police and the phone company in *Smith* is *nothing* compared to the relationship that has apparently evolved over the last seven years between the Government and telecom companies." Mem Op. at 48. "In *Smith*, the Court considered a one-time, targeted request for data regarding an individual suspect in a criminal investigation, *see Smith*, 442 U.S. at 737, which in no way resembles the daily, all-encompassing, indiscriminate dump of phone metadata that the NSA now received as part of its Bulk Telephony Metadata Program." *Id.* "[T]he almost-Orwellian technology that enables the Government to store and analyze the phone

circumstances, which include the evolutions in the Government Defendant surveillance capabilities, citizens' phone habits, and the relationship between the NSA and telecom companies have "become so thoroughly unlike those considered by the Supreme Court thirty-four years ago that a precedent like *Smith* simply does not apply."[17] Mem. Op. at 45. The Supreme Court also agrees with this Court's reasoning as demonstrated in the Supreme Court's recent decision in *Riley*.

In *Riley*, the Supreme Court held that "[t]he police generally may not, without a warrant, search digital information on a cell phone seized from an individual who has been arrested." In reaching their decision, the Supreme Court explained the significance of modern cellular information. For example, the Supreme Court found that "[M]odern cell phones are not another technological convenience. With all they contain and all they may reveal, they hold for many Americans "***the privacies of life***[.]"[18] *Id.* at *20 (emphasis added). The Supreme Court also recognized that "more substantial privacy interests are at stake when digital data is involved" because "cell phones can store millions of pages of text, thousands of pictures, or hundreds of videos. . . . [which] [have] several interrelated privacy consequences." *Id.* at *2-3. Chief Justice

---

metadata of every telephone user in the United States is unlike anything that could have been conceived in 1979." *Id.* at *489*.

[17] There has been a "rapid and monumental shift towards a cell phone-centric culture[, which] means that the metadata from each person's phone 'reflects a wealth of detail about [their] familial, political, professional, religious, and sexual assertions,' *United States v. Jones*, 132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring), that could not have been gleaned from a data collection in 1979." Mem. Op. at 54.

[18] "A decade ago officers might have occasionally stumbled across a highly personal item such as a diary, but today many of the more than 90% of American adults who own cell phones keep on their person a digital record of nearly every aspect of their lives." Riley, 2014 WL 2864483, at *3. "[M]odern cell phones have an immense storage capacity." *Id.* "[D]ata on [modern] phone[s] can date back for years." *Id.* "Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." (Citing *Ontario v. Quon*, 560 U.S. 746, 760 (2010)). *Id.* at *15.

John Roberts, in delivering the majority opinion, even found that "modern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* at *9. The Supreme Court's modern up-to-date view of today's cellular phones has surely impacted the extent that the Government Defendants can lawfully intrude upon citizens' rights.

In discussing the relevance of cellular data when it is unlawfully searched by the Government, the Supreme Court held that "a search of digital information on a cell phone does not further [ ] government interests . . . and implicates substantially greater individual privacy interests than a brief physical search." *Id.* at *1. Due to the highly sensitive data located in our cell phones, the Supreme Court made it clear that "**a warrant is generally required before [ ] a search, even when a cell phone is seized incident to arrest.**"[19] *Id.* at *19 (emphasis added). Because "[d]igital data stored on a cell phone cannot itself be used as a weapon" and "can endanger no one," the Government Defendants do not have a compelling reason to search citizens' telephony and internet metadata at their discretion. *See id.* at *2.

What is more compelling in the present case is that Plaintiffs and other innocent citizens, whose metadata has been continuously searched without a warrant, have committed no crime to warrant a search by the Government Defendants, especially when they were never arrested to begin with. If the Supreme Court has found that criminals have rights to privacy regarding their mobile and cellular phones, then almost 300 million innocent citizens' must have at least the same rights, if not more! Furthermore, unlike in *Riley*, the NSA has access to, and did access, entire telephone conversations, which it keeps stored for at least five years in the Government

---

[19] "Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—*get a warrant*." *Riley*, 2014 WL 2864483, at *20 (emphasis added).

Defendants' super computers. Although these reasons alone are enough to find that the Government Defendants violated Plaintiffs' rights, and that they should be prevented from further violating them, there is much more this Court can consider.

Similar to this Court's finding that the Supreme Court in *Smith* could not have predicted the extent that cellular technology would advance, nor could it have predicted the extent that data would be searched, the Supreme Court found that today's technology is nearly inconceivable just a few decades ago. *Compare* Mem. Op. at 46-47 ("[T]he Court in 1979 [could not] have ever imagined how the citizens of 2013 would interact with their phones. . . . [T]he almost Orwellian technology that enables the Government [Defendants] to store and analyze the phone metadata of every telephone user in the United States is unlike anything that could have been conceived in 1979 [when *Smith* was decided]."),[20] *with* Riley, 2014 WL 2864483, at *9 ("Even less sophisticated phones[, such as a flip phone] . . . , which have already faded in popularity since Wurie was arrested in 2007, have been around for less than 15 years. Both phones are based on technology nearly inconceivable just a few decades ago,[21] when *Chimel*[22] and *Robinson*[23] were

---

[20] "Thirty-four years ago, city streets were lined with pay phones. Thirty four years ago, when people wanted to send 'text messages,' they wrote letters and attached postage stamps." Memo. Op. at 52. "Put simply, people in 2013 have an entirely different relationship with phones than they did thirty-four years ago." *Id.* at 53.

[21] "That is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together. Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom." Riley, 2014 WL 2864483, at *23. "Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day." *Id.* *15. "Most people cannot lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read—nor would they have any reason to attempt to do so." *Id.* at *14.

[22] In *Chimel v. California*, 695 U.S. 752, 753-54 (1969), the Police searched just one home. In the present case, the Government Defendants are searching the pockets of over 300 million

27

decided [in 1969 and 1973, respectively]"). Justice Samuel Alito, who concurred in part and dissented in part, "agree[d] that we should not mechanically apply the rule used in the predigital era to the search of a cell phone." *Riley*, 2014 WL 2864483, at *22. The Supreme Court's ruling in *Riley* clearly lays the foundation for what is to come in the present case—that is, that past Supreme Court rulings, around the time of *Smith*, analyzing unlawful police and government searches, do not apply to the unconceivable circumstances of today.

The Supreme Court also analyzed the United States Court of Appeals for the First Circuit's decision in *United States v. Wurie*, 728 F.3d 1 (1st Cir. 2013). In *Wurie*, the officers who searched Wurie's cell phone "knew exactly what they would find therein: data. They also knew that the data could not harm them." *Riley*, 2014 WL 2864483, at *10 (citing *Wurie*, 28 F.3d at 10). Here, the Government Defendants also knew exactly that they would find citizens' telephony and internet metadata, both of which could not harm the Government Defendants. Accordingly, pursuant to prior Supreme Court rulings, the Government Defendants had no basis to search the metadata of innocent citizens who did not expect such warrantless intrusion into their private lives.

Further support that the Government Defendants have no basis to search citizens' telephony and internet metadata is the fact that in *Riley* and in *Klayman I*, *Klayman II*, and *Klayman III*, the government could not offer evidence to show that their concerns were based on actual experience or harm to warrant intrusion of privacy. *Compare* Mem. Op. at 61 ("[T]he Government [Defendants] [do] *not* cite a single instance in which analysis of the NSA's bulk metadata collection actually stopped an imminent attack, or other wise aided the Government

---

citizens. The plethora of information found in one's cell phone is equivalent to the amount of information one can find from searching one's home. The Government Defendants are thus bursting into the homes of everyone.

[23] *United States v. Robinson*, 414 U.S. 218 (1973).

[Defendants] in achieving any objective that was time-sensitive in nature."),[24] *with Riley*, 2014 WL 2864483, at *10 ("The United States and California both suggest that a search of cell phone data might help ensure officer safety in more indirect ways, for example by alerting officers that confederates of the arrestee are headed to the scene. There is undoubtedly a strong government interest in warning officers about such possibilities, ***but neither the United States nor California offers evidence to suggest that their concerns are based on actual experience.***") (emphasis added); *see also Chandler v. Miller*, 520 U.S. 305, 318-319 (1997) ("Notably lacking in respondents' presentation is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule."). The Supreme Court in *Riley* also found that "[t]he fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years." *18. Ironically, in the present case, it has been discovered that the NSA stored citizens' valuable metadata for five years as well. Mem. Op. at 16, 36, 56. As such, the Supreme Court's ruling is notably applicable here once again. The decision in *Riley* clearly reiterates this Court's decision that *Smith* does not apply to the circumstances in this case. The decision in *Riley* also demonstrates that the Supreme Court ruled in *Riley* with an eye over Plaintiffs' shoulders at this case.

---

[24] "Given the limited record before me at this point in the litigation—most notably, the utter lack of evidence that a terrorist attack has ever been prevented because searching the NSA database was faster than other investigative tactics—I have serious doubts about the efficacy of the metadata collection program as a means of conducting time-sensitive investigations in cases involving imminent threats of terrorism." Mem. Op. at 62.

III. PLAINTIFFS DID NOT VIOLATE THE RULE AGAINST "CLAIM-SPLITTING," AND THEY MOVED FOR CLASS CERTIFICATION WITHIN THE ALLOWABLE NINETY DAYS UNDER DISTRICT OF COLUMBIA LOCAL CIVIL RULE 23.1(b).

A. Plaintiffs Did Not Violate The Rule Against Claim-Splitting Because Their Claim In *Klayman III* Is A New Action Involving New Subject Matter, Including New Class Action Allegations, At A New Time, Brought By New Plaintiffs Against New Defendants.

In *Dorsey v. Holman*, 476 F. App'x 861, 863 (D.C. Cir. 2012), the United States Court of Appeals for the District of Columbia Circuit held that a plaintiff has "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant."

Here, Plaintiffs' claim in *Klayman III* is a separate action from *Klayman I* and *Klayman II* because new offenses, involving new subject matter, by new plaintiffs against new defendants occurred during a time period subsequent to the filing of *Klayman I* and *Klayman II*. Unlike in *Klayman I* and *Klayman II*, *Klayman III* is the official class action complaint against the Government Defendants. *See Klayman III* at 3. Here, Plaintiffs identify the existence a Government program entitled "MUSCULAR," in which "the FBI, CIA, and NSA have been intercepting information from internet companies such as Google and Yahoo! as it travels over fiber optic cables from one data center to another." *Klayman III* at 6. The original complaint in *Klayman I* identified Larry Klayman as the sole plaintiff. *See Klayman I* at 1. In *Klayman III*, Larry Klayman, Charles and Mary Ann Strange, Michael Ferrari, and Matt Garrison are now listed as plaintiffs. *See Klayman III* at 1. Similarly, in *Klayman III*, defendants John O. Brian, James Comey, the FBI, and the CIA are added as defendants. The Government Defendants even admit that in addition to differences pertaining to class action allegations, "the Second Amended Complaint in *Klayman II* also contains allegations regarding the Plaintiffs' communications with

30

foreign countries, which are not included in [*Klayman III*] . . . ." *See* Gov. Motion to Dismiss *Klayman III* at 9, n.5.

Under the circumstances, Plaintiffs did not violate the rule against claim-splitting, as the Government Defendants wrongfully contend, because *Klayman III* is a separate action with newer, and different, circumstances.[25]

**B.      Under LCvR 23.1(b), It Is Undisputed That Plaintiffs Moved For Certification Under FRCP 23(c)(1) Within Ninety Days After Filing The Complaint.**

District of Columbia Local Civil Rule ("LCvR") 23.1(b) provides that "[w]ithin ninety [(90)] days after the filing of a complaint in a case sought to be maintained as a class action, unless the court in the exercise of its discretion has extended this period, the plaintiff shall move for a certification under Rule 23(c)(1), Federal Rules of Civil Procedure ("FRCP"), that the case may be so maintained. . . ." [T]he court may enlarge the 90-day period within which the motion for certification is to be filed. Comment to LCvR 23.1(b) (amended Oct. 10, 1990). FRCP 23(c)(1) provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."

Here, Plaintiffs filed *Klayman III* on January 23, 2014. Approximately two months later, on March 25, 2014, Plaintiffs filed their Motion to Certify Class. Plaintiffs have clearly met the ninety-day deadline under LCvR 23.1(b) to move for class certification as required by the statute. Therefore, Plaintiffs' claim should not be dismissed because Plaintiffs followed the local rules.

---

[25] If the Court finds that this action too closely mirrors *Klayman II*, which Plaintiffs take the position that it does not, the Court may nevertheless consolidate the claims to include a class action. This Court may also consider consolidating this case with Senator Rand Paul's related class action in *Paul v. Obama*, No. 14-cv-262 (D.D.C. Feb. 18 2014), to save valuable court and private resources. Moreover, consolidation would bring more attorneys to the class action Plaintiffs. This is important as the potential class is huge.

C.     Plaintiffs Have Properly Moved For Class Certification Because No Time Has
Lapsed As Plaintiffs' Motions For Extensions Of Time Were Pending.

No time has lapsed as Plaintiffs were awaiting a ruling on their motions for extension of

time in *Klayman I* and *Klayman II*. Of course, given the heavy docket, the extreme national

importance of this case, and the interest this case serves to the public, this Court has a lot to

consider. In a Praecipe dated January 15, 2014, while the motions for extension were pending,

Plaintiffs told the Court that "in order to streamline and to expedite [*Klayman I* and *Klayman II*] .

. . , they [would] not be moving for class action but rather there [would] be filed a separate class

action suit filed as a related case." Praecipe, dated Jan. 15, 2014. The purpose of the Praecipe

was to provide notice of a new class action, that would ultimately benefit Plaintiffs and the

American people, and to get to the Supreme Court in an expedited manner. Plaintiffs, at this

time, were awaiting a decision on their motions for extension of time. As such, no time has

lapsed, as these extensions are technically still pending.

Moreover, Senator Rand Paul's class action is currently pending before this Court.

Plaintiffs take the position that since Rand Paul's class action is related to Plaintiffs' case, and

because this Court has to consider Rand Paul's class action anyway, this Court should consider

consolidating the cases to save judicial and private resources, in addition to the fact that having

more attorneys on such a large a case is beneficial. Thus, there is no need to dismiss Plaintiffs'

case when a another class action involving related subject matter is pending before this same

Court. Also, while the motions to extend were pending, and after the December 16, 2013

Memorandum Opinion was issued by this Court, Plaintiffs informed this Court once again in the

February 3, 2014 Hearing that they were going to streamline the cases for the benefit of the

Court and appellate review. Transcript, Hearing, 11:12-16 (Feb. 3, 2014); Mem. Op. The

American people cannot afford to have this case dismissed.

D.      Even If the Ninety-Day Period Is Determined To Have Begun Tolling When
        Plaintiffs Filed The Complaint In *Klayman I*, Plaintiffs' Request For Extension
        May Be Granted Under The Doctrine Of Excusable Neglect.

In the unlikely event that this Court determines that the ninety-day period began tolling

when Plaintiffs filed the complaint in *Klayman I*,[26] Plaintiffs' requests for extension of time may

be granted because Plaintiffs' meeting of the four *Pioneer* factors weigh in favor of excusable

neglect. FRCP Rule 6(b) provides that "[w]hen an act may or must be done within a specified

time, the court may, for good cause, extend the time: (A) with or without motion or notice if the

court acts, or if a request is made, before the original time or its extension expires; or (B) on

motion made after the time has expired if the party failed to act because of excusable neglect."

District courts have discretion to determine whether to grant a motion for extension of the

ninety-day deadline for filing a motion for certification. *Shallal v. Gates*, 252 F.R.D. 2, 6

(D.D.C. 2008). Moreover, district courts may exercise their discretion and decide whether to

consider a late-filed response. *See D.A. v. District of Columbia*, No. 07-1084, 2007 WL 4365452,

*2 (D.D.C. 2007) (citing *Fed. Deposit Ins. Corp. v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir.

1997)). "The most natural reading of [LCvR 23.1(b)] requires the filing of a certification motion

within ninety days of **the first complaint that states class allegations**. . . ." *Howard v.*

*Gutierrez*, 474 F. Supp. 2d 41, 54-55 (D.D.C. 2007) (finding that the ninety-day period was

calculated once the plaintiff had filed a complaint **alleging class claims**) (emphasis added).

For the court to consider a late-filed response, plaintiffs need only demonstrate that the

delay was the result of excusable neglect. *See District of Columbia*, 2007 WL 4365452 at *3.

"The Supreme Court has designated four factors for determining when a late filing may

---

[26] Plaintiffs do not concede that they made untimely filings because, as stated, no time has lapsed
as Plaintiffs' motions for extensions of time for class certification were pending. Plaintiffs were
not late in filing for extensions. Plaintiffs only discuss the doctrine of excusable neglect here for
the purposes of providing yet another argument why their Complaint should not be dismissed.

constitute 'excusable neglect.'" *Id.* (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). These factors include: "(1) the danger of prejudice to the [opposing party], (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith." *Id.* (quoting *In re Vitamins Antitrust Class Action*, 327 F.3d 1207, 1209 (D.C. Cir. 2003) (citing *Pioneer*, 507 U.S. at 395). The determination of whether a party's neglect is excusable requires taking into account all relevant circumstances surrounding the party's omission. *See id.* A simple mistake by counsel does not excuse an untimely filing. *See id.* at *4. Excusable neglect, however, is a somewhat elastic concept and is not limited strictly to omissions caused by circumstances that are beyond the control of the plaintiff. *See Cryer v. InterSolutions, Inc.*, No. 06-cv-2032, 2007 WL 1191928, *5 (D.D.C. 2007) (citing *Pioneer*, 507 U.S. at 392).

Under factor one, this Court has found that a defendant is not prejudiced where the defendant has not himself asserted that he would in fact be prejudiced. *See District of Columbia*, 2007 WL 4365452 at *3. A defendant is also not prejudiced where "defendants have been on notice since the filing of the original complaint . . . that plaintiffs intended to pursue a class action." *See Cryer*, 2007 WL 1191928, at *6. In analyzing factor two, this Court found that a delay of approximately two-weeks does not have an impact on judicial proceedings. *Id.* More significantly, this Court has found that a "length of delay [is] 'not great' where [a] motion for extension of time to file for class certification [is] filed **22 days after [the] deadline**." *District of Columbia*, 2007 WL 4365452 at *3 (citing *Cryer*, 2007 WL 1191928, at *6) (emphasis added). An approximate three-week delay has little, if any, impact on further proceedings in United

States District Court for the District of Columbia as a result of a pending motion to dismiss in such an early stage of the litigation. *See Cryer*, 2007 WL 1191928, at *6.

Under the fourth factor, bad faith is determined upon the plaintiff's conduct after learning of the missed deadline. *Id.*; *see also Howard*, 474 F. Supp. 2d at 57 (finding that the plaintiffs did not act in good faith primarily because they waited until three months, after they were alerted that they missed the deadline, before they attempted to mitigate the error). Factor three, which covers "mistake" or "reason for delay," is perhaps the single most important of the four *Pioneer* factors. *Id.* (quoting *Webster v. Pacesetter, Inc.*, 270 F. Supp. 2d 9, 14-15 (D.D.C. 2003)); *see also Halmon v. Jones Lang Wootton USA*, 355 F. Supp. 2d 239, 244 (D.D.C. 2005) ("Parties have an obligation to monitor the court's docket and keep apprised of relevant deadlines."). Though an untimely filing may be rejected where the only triggering Pioneer factor is a mistake made by counsel, "the question of whether attorney error may constitute 'excusable neglect' is within the discretion of the district court, and the court [does] not abuse its discretion" in determining the error did in fact constitute 'excusable neglect.'" *See District of Columbia*, 2007 WL 4365452, at *4-6; *In re Vitamins*, 327 F.3d at 1210.

In *Cryer*, this Court determined that the four *Pioneer* factors weighed in favor of finding excusable neglect on the part of the plaintiffs. 2007 WL 1191928, at *6. This Court found that the defendants were not prejudiced since they had been on notice since the original complaint that plaintiffs intended to pursue a class action. *Id.* This Court also found that the 22-day delay was not great and had little impact on further proceedings. Compare *Id.* (finding that **a three-week delay weighed in favor** of finding excusable neglect) (emphasis added), *with Howard*, 474 F. Supp. 2d at 54 (finding that **a six-month delay did not weigh in favor** of finding excusable neglect) (emphasis added). In determining the reasoning behind the delay, this Court found that

plaintiffs were not unreasonable to think that the 90-day period began to run from the filing of their amended complaint. *Id.* Plaintiffs were also deemed to have acted in good faith when they promptly filed their motion for extension of time once they learned from this Court that the 90-day period ran from the filing of the original complaint. Compare *Id.* (finding that plaintiffs **acting promptly to file their motion for extension of time weighed in favor** of excusable neglect) (emphasis added), *with Howard*, 474 F. Supp. 2d at 57 (finding that plaintiffs **waiting three months after being notified that they had missed the deadline before filing for an extension of time did not weigh in favor** of excusable neglect) (emphasis added).

In *D.A. v. District of Columbia*, this Court determined that three of the four *Pioneer* factors favored the plaintiffs. *District of Columbia*, 2007 WL 4365452 at *3. Plaintiffs' untimely response was only found to not be the result of excusable neglect because "the delay was the result of confusion created by counsel's involvement in numerous other cases, insofar as [counsel] believed that a motion for enlargement of time had been filed. . . . [and the] mistake could have been remedied by a simple look at the docket." *Id.* at *6. It is important to point out, however, that attorney mistake does not necessarily eliminate the excusable neglect defense. *See id.* Instead, it is the nature of the mistake that matters in addition to whether the other *Pioneer* factors were successfully met. *See id.* "*In re Vitamins,* for example, involved a class member that missed the deadline for opting-out of a settlement. . . . The party's motion to modify the final order was granted by the district court because, though the delay was within her reasonable control, the mistake was outweighed by the other three *Pioneer* factors. *Id.* (explaining *In re Vitamins*, 327 F.3d at 1208-09).

In the present case, all four of the *Pioneer* factors weigh in favor of finding excusable neglect on the part of Plaintiffs. First, although the original complaint in *Klayman I* was filed on

June 6, 2013, the complaint itself did not state any class allegations. *See Howard*, 474 F. Supp. 2d at 54-55 ("The most natural reading of [LCvR 23.1(b)] requires the filing of a certification motion **within ninety days of the first complaint that states class allegations**. . . ."); *Klayman I*. Class allegations were not stated until three days later on June 9, 2013. *Klayman I*, First Amended. Thus, the 90 days, if determined to not have tolled upon the filing of *Klayman III*, began tolling on June 9, 2013, when the very first class allegations were stated. Accordingly, the 90-day period would have supposedly ended on September 7, 2013. Plaintiffs filed their Motion for Extension twenty-three days (23) after the alleged deadline, on September 30, 2013. *See* Mot. for Ext. of Time to Certify Class Action, *Klayman I*.

Plaintiffs filed *Klayman II* on June 12, 2013, and thus, the 90-day period for the *Klayman II* complaint ended on September 10, 2013. *Klayman II*. Plaintiffs filed their Motion for Extension only twenty (20) days after the deadline on September 30, 2013. *See* Mot. for Ext. of Time to Certify Class Action, *Klayman II*. Thus, Plaintiffs, under the Government Defendants' theory of tolling, moved for extensions of time to move for class certification in *Klayman I* and *Klayman II* twenty-three (23) days and twenty (20) days, respectively, rather than the twenty-seven (27) and twenty-one (21) days that the Government Defendants have incorrectly calculated in their Motion to Dismiss in *Klayman III*. *See* Gov. Motion to Dismiss *Klayman III* at 6.

Accordingly, in analyzing factor two of the *Pioneer* factors, Plaintiffs' short delays in *Klayman I* and *Klayman II* of 23 days and 21 days, respectively, after the 90-day deadline, weigh in favor of finding excusable neglect, as this Court has previously ruled. *See Cryer*, 2007 WL 1191928, at *6 (finding that a 22-day delay was not great and thus weighed in favor of excusable neglect); *but see Howard*, 474 F. Supp. 2d at 54 (finding that plaintiffs' six-month delay did not weigh in favor of excusable neglect).

In analyzing factor one of the *Pioneer* factors, the Government Defendants are not prejudiced because they have not themselves asserted that they would be prejudiced by the extension of time. *See District of Columbia*, 2007 WL 4365452, at *3 (finding that a defendant is not prejudiced where the defendant has not himself asserted that he would in fact be prejudiced). Moreover, the Government Defendants have been on notice since the original complaint in *Klayman I*, which asserted class claims on June 9, 2013, that Plaintiffs intended to pursue a class action. *See Cryer*, 2007 WL 1191928, at *6 ("[D]efendants are not prejudiced . . . [where] [d]efendants have been on notice since the filing of the original complaint . . . that plaintiffs intended to pursue a class action . . . ."). In any event, the Government Defendants could not reasonably assert, even if they wanted to, that a short delay in time would prejudice them because they have it taken it upon themselves to delay the appeal in this case for months.

Under factor four, Plaintiffs acted in good faith because, unlike the plaintiffs in *Howard*, Plaintiffs did not wait several months after being notified that they missed the 90-day deadline before filing for an extension of time. *See* 474 F. Supp. 2d at 57 (finding that waiting three months after being notified of a missed deadline before filing for an extension of time does not weigh in favor of excusable neglect). In fact, Plaintiffs cannot be shown to have acted in bad faith because Plaintiffs were not notified by the Government Defendants nor this Court that they missed the 90-day deadline at any time prior to them filing for an extension of time. If such notice had occurred, Plaintiffs would have had no reason to further delay filing for an extension.

In analyzing factor three, the final *Pioneer* factor, which concerns whether mistake was the reason for delay, Plaintiffs would have only been delayed in their filing for an extension of time as the result of the uncertainty of new information that came to light as Plaintiffs prepared for class certification. *See Pioneer*, 507 U.S. at 392 ("Although inadvertence, ignorance of the rules,

or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' . . . is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant."); Mot. for Ext. of Time to Certify Class Action, *Klayman I*. Plaintiffs were also in the process of ensuring that all Defendants were served so that the lawsuit could proceed. Mot. for Ext. of Time to Certify Class Action, *Klayman I*. Unlike the plaintiffs in *D.A. v. District of Columbia*, Plaintiffs' delay was not the result of confusion created by counsel's involvement in numerous other cases. 2007 WL 4365452, at *6. Moreover, Plaintiffs did not make a mistake of law, *Webster*, 270 F. Supp. 2d at 12-13 (finding that a mistake of law does not constitute excusable neglect), nor did Plaintiffs delay their filing as a result of "inadvertence, mistake, or carelessness." *Pioneer*, 507 U.S. at 388. Under the circumstances, in the unlikely event that Plaintiffs are determined to have delayed filing for an extension of time to certify a class action, Plaintiffs' meeting of the fourt *Pioneer* factors weighs in favor of excusable neglect.

Even without the third factor, it is important to point out that Plaintiffs have met at least three of the four *Pioneer* factors, which is significant in determining that Plaintiffs have a valid defense under excusable neglect. *See In re Vitamins*, 327 F.3d at 1208 (ruling that although "the delay was within [the plaintiff's] reasonable control, the "mistake was outweighed by the other three *Pioneer* factors"); *see also Yesudian v. Howard Univ.*, 270 F.3d 969, 971 (D.C. Cir. 2001) (accepting an untimely filing because, though the delay was caused by mistaken reliance on local rules, the other *Pioneer* factors tipped the balance). In *In re Vitamins,* the plaintiff met the same three factors as Plaintiffs have been shown to have met here. *See In re Vitamins*, 327 F.3d at 1208. Therefore, at the very minimum, Plaintiffs' meeting of at least three of the four factors would significantly weigh in favor of excusable neglect. *See id.* This Court has great deference,

as owed by the Court of Appeals, in what is effectively the District Court's decision to allow the meeting of just three *Pioneer* factors constitute excusable neglect. *District of Columbia*, 2007 WL 4365452, at *6 (citing *Yesudian*. 270 F.3d at 971). Accordingly, in addition to the many reasons set forth above, Plaintiffs motions for extension are timely under the doctrine of excusable neglect.

E.     LCvR 23(b), Which Imposes A Requirement Of Form, Cannot Be Enforced To Cause Plaintiffs To Lose Their Right To Pursue A Class Action Against The Government Defendants Because Any Perceived Failure To Comply To The Rule Was Nonwillful.

FRCP 83(a)(2) states that "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." *See also* Plaintiffs' Motion to Reinstate Class Claims in *Howard*, No. 05-1968, dated Feb. 21, 2007 ("Howard Plaintiffs' Motion") (quoting 5 Moore's Federal Practice § 23.62) ("Although a practitioner should never be ignorant of or deliberately ignore any of these local rules on class actions, an unintended violation of a local rule need not always be fatal to class certification. Local rules must yield when their requirements conflict with Rule 23. . . . Furthermore, a court may not use a local rule to deprive a party of any of that party's rights so long as the failure to comply with the local rule is not willful."). As such, the procedural requirements of LCvR 23.1(b) should not be used to deprive millions of members of their rights, especially where a potential failure to comply was unintentional. *See id.* Plaintiffs have acted in good faith, they respect the local rules, and they most certainly did not file *Klayman III* in an effort to circumvent LCvR 23.1(b) as the Government Defendants maliciously and wrongfully allege.

IV.    PURSUANT TO FRCP 12(d) AND 56(d), IN THE UNLIKELY EVENT THAT THIS
       COURT CONSIDERS THE GOVERNMENT DEFENDANTS' FALSE FACTS IN
       THEIR ATTACHED DECLARATION TO THEIR MOTION TO DISMISS,
       PLAINTIFFS ARE ENTITLED TO DISCOVERY TO RESPOND.

Pursuant to FRCP 12(b) and 12(d), Plaintiffs move this Court to grant discovery and/or

an in-camera investigation. *See* FRCP 12(d) Motion, filed contemporaneously herewith. Under

FRCP12(d), a motion to dismiss may be treated as a motion for summary judgment if matters

outside of the pleadings are presented to, and are not excluded, by the Court. FRCP 12(d) states

that "[i]f, on a motion under [FRCP] 12(b)(6) or 12(c), matters outside the pleadings are

presented to and not excluded by the court, the motion must be treated as one for summary

judgment under [FRCP] 56. All parties must be given a reasonable opportunity to present all the

material that is pertinent to the motion." Fed. R. Civ. P 12(d).

Under FRCP 56, [a] party may move for summary judgment, identifying each claim or

defense — or the part of each claim or defense — on which summary judgment is sought. The

court shall grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law. The court should

state on the record the reasons for granting or denying the motion. Specifically, FRCP 56(d)

provides that [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it

cannot present facts essential to justify its opposition, the court may (1) defer considering the

motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3)

issue any other appropriate order."[27]

A summary judgment motion will not survive if a dispute about a material fact is

"genuine," that is, "if the evidence is such that a reasonable jury could return a verdict for the

---

[27] Plaintiffs have asked Opposing Counsel for consent for their 12(d) motion, but Opposing
Counsel responded that they do not consent.

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986). Under FRCP 56, summary judgment is appropriate only "*after adequate time for discovery* and upon motion, against a party who failed to make a showing sufficient to establish the existence of an element essential to that party's case, and which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (emphasis added). Rule 56(d) specifically authorizes the court to postpone consideration of a motion for summary judgment upon evidence that a party has not been given an opportunity to obtain factual support of its claims or defenses. "Because the movant has the tactical advantage of choosing when to file a summary judgment motion, [Rule 56(d)] is designed entirely to protect the nonmoving from having to respond to a summary judgment motion before he or she is able to obtain evidence to oppose the motion." Edward Brunet, *The Timing of Summary Judgment,* 198 F.R.D. 679, 687 (2001). "[Rule 56(d)] is designed to be a shelter against the precipitous entry of summary judgment." *Donovan v. Nellis*, 528 F. Supp. 538, 542 (N.D. Fla. 1981).

In the present case, the Government Defendants hold all of the cards. Thus, if this Court were to consider the facts set forth by the Government Defendants, which are demonstrably false, and if the Court does not proceed with discovery or does not allow an in-camera investigation, before the Government Defendants' Motion to Dismiss is disposed of, the facts that are already on the record show that the Government Defendants' facts are false and misleading.

Furthermore, the fact that the Government Defendants have submitted a Declaration with their Motion to Dismiss suggests that they may be requesting this Court to grant summary judgment. *See* Gov. Motion to Dismiss *Klayman III*, Attached Declaration of Shea. However, the Government Defendants have not complied with LCvR 7(h). LCvR 7(h) states that "[e]ach

motion for summary judgment shall be accompanied by a statement of material facts as to which

the moving party contends there is no genuine issue . . . ." If the Government Defendants

intended to convert the Motion to Dismiss to a summary judgment motion, they should have

included a statement of material facts. The Court must therefore deny the Government

Defendants' Motion to Dismiss as procedurally and substantively defective.

## **<u>CONCLUSION</u>**

For the aforementioned reasons, Plaintiffs' Complaint should not be dismissed. Plaintiffs

do not lack standing to assert any of their claims, Plaintiffs have stated more than enough legally

sufficient facts to survive a motion to dismiss, and Plaintiffs have not engaged in any so-called

"claim-splitting." Moreover, while the motions for extension were pending until Plaintiffs gave

notice that Plaintiffs were no longer going to pursue the class actions in *Klayman I* and *Klayman*

*II* to streamline the cases for the benefit of the parties, this Court, and to move the issues along

for potential final expeditious review by the Supreme Court. Plaintiffs thus timely informed this

Court that Plaintiffs would streamline the cases for Plaintiffs and the American people, and that

they would file a class action in *Klayman III*, to ultimately get issues before the Supreme Court

as soon as possible.

The constitutional issues that have been raised in these cases, as this Court has stated, are

"at the **<u>pinnacle of public national interest</u>**." *See* Transcript of Status Conference, dated Oct.

31, 2013, at 7 (emphasis added). In further recognizing the importance of these issues, this Court

has expressed that it "cannot imagine a more 'indiscriminate' and 'arbitrary invasion' than [the]

systematic and high-tech collection and retention of personal data on virtually every single

citizen for purposes of querying and analyzing it without prior judicial approval." The Court

further stated that the program surely "infringes on 'that degree of privacy' that the Founders

enshrined . . . ." Mem. Op. at 64.

The Supreme Court has also recognized the importance of addressing these constitutional issues. Justice John Roberts stated in *Riley* that "the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity. **Opposition to such searches was in fact one of the driving forces behind the Revolution itself.**"[28] *Riley*, 2014 WL 2864483, at \*27 (emphasis added). Accordingly, as this Court agrees, and the Supreme Court will agree, the case before us is of extreme national importance, and thus, a class action is necessary to protect the rights of not just Plaintiffs, but also the American people. Plaintiffs' cases cannot and should not be dismissed.


Dated: July 23, 2014


Respectfully submitted,

/s/ *Larry Klayman*
Larry Klayman, Esq.
Attorney at Law
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

---

[28] "[T]he Founders did not fight a revolution to gain the right to government agency protocols." *Riley*, 2014 WL 2864483, at \*22.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 23rd day of July, 2014 a true and correct copy of the to the United States Court District Court for the District of Columbia. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Respectfully submitted,

<u>/s/ *Larry Klayman*</u>
Larry Klayman, Esq.
Attorney at Law
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com